Manzi *v.* Manzi, Appellant.

Argued October 26, 1933.

Before Trex-
ler, P. J., Keller, Cunningham, Baldrige, Stadtfeld,
Parker and James, JJ.

*Marshall A. Coyne,* and with him *Joseph Alessan-
droni,* for appellant.

*Morris C. Solomon,* and with him *Bernard J. M. Phillips,* for appellee.

OPINION BY TREXLER, P. J., March 3, 1934:

This is an action in divorce, the ground laid being that the libellant has suffered such indignities at the hands of the respondent as to render his condition intolerable and life burdensome and thereby compelling him to withdraw from his home and family. The lower court granted the divorce.

The entire tenor of libellant's complaint is that the respondent called him vile names threatened his life and by a continuous course of conduct of this nature made his life miserable. The mere use of opprobrious words is not conclusive of the matter and must not necessarily result in the granting of the divorce. All the circumstances in the case must be considered in order to arrive at a just conclusion. The wife was a jealous woman. This jealousy manifested itself shortly after they were married, but it seems the real difficulty between the parties developed when he was taking French lessons.

The reading of the testimony of the libellant does not impress us as to his frankness and the corroboration on the part of his father does not add much weight, for he apparently is intensely interested in the case. We present a summary of the facts, with comments, in the order in which they appear in the record. The libellant testified that the respondent threatened to kill him and in this he is confirmed by the testimony of their daughter, but the daughter apparently did not attach any serious meaning to it and evidently it was not so intended, for the wife ministered to her husband in sickness and health up to the time when he left her and had unlimited opportunity of taking his life if she so desired.

It is very plain that the wife was jealous, but the trouble could have been cured if the husband had acted discreetly. Where it is claimed that the husband left his home because of the nagging of his wife or of her abuse, naturally the inquiry is what caused such action on her part and if the husband provoked it, even if he was not actually unfaithful, some justification is offered for her conduct. There was a girl by the name of Prost of whom the husband apparently was fond. He denies this, but for four or five years he maintained an intimate friendship with the woman. She was twenty-five years of age. She taught French and also was a child's nurse. The libellant was her pupil. He had an insurance policy in favor of his wife, but changed the beneficiary and made the policy payable to his French teacher. The excuse he gives for that is that he had not paid her anything for the lessons, so he wished to recompense her. There was correspondence between the French teacher and the libellant. The French language was used. The wife secured the letters and preserved them, and the husband prevailed upon one of the daughters, with a promise of a reward, to secure the letters, but failed. Afterward on the promise on his part that they should live in peace thereafter, the wife gave the letters to the husband. One of these letters was written on the letterhead of the bank at Wayne where he was employed and contained an arrangement to take the lady to the movies. After the wife surrendered the letters he promised that this whole matter would be ended, but he still continued to write letters to the lady and to come home late. The wife describes the letters as dishonest because they contained lots of crosses and lots of o's and the letters were full of love. She attaches a meaning "of dishonest things" to the crosses and o's.

The libellant admits that his wife was a good housekeeper, and did not have any inclination to consort improperly with other men and cleaned and cooked for him. Her story is that everything was all right until he became acquainted with a woman who was of ill fame. There was no proof of the latter except that the wife says that the woman had that reputation in the neighborhood. This alleged liason continued only for a short time, for the woman moved away. The respondent admits that she scolded her husband because he was coming in at one to one-thirty in the morning and would tell where he had been, but inquiry by her over the telephone would disclose that he was telling an untruth and she would then call him a liar. When his father was sick at the hospital, the libellant would come in at early hours of the morning and give for an excuse that he had been at the hospital which on inquiry was found to be untrue.

After the libellant had brought his suit for divorce, the respondent wrote to his employer telling him that her husband was intimate with Miss Prost. Considerable stress is laid upon this act on her part. It may have been ill advised, but the avowed purpose stated in, the writing was not to cause him to lose his job, but that he might return to his family. She says her love for the children was the incentive for her so doing.

One of the daughters who was eighteen years of age, testified that her mother and father did quarrel, that he had a French woman whom he was going to see and that he stayed out late at nights. She corroborates her mother on the fact that he would state where he had been and after telephoning there, she would find that he was not telling the truth. He had telephone calls to Wayne 1195 and asked for her. This happened twice and once when a stranger answered, the libellant answered that he had received every-

thing. Respondent claims the answer referred to some flowers that had been sent to him when he was sick. The letters which the young lady wrote, she says, talked "about spring and violets, first violets and the walks they took and where they were." She confirms the mother in the statement that the father promised her a ten dollar airplane ride if she would find the letters. She said that her mother called her father quite often a liar in Italian. She heard her mother tell her father, "I will kill you," but she says she did not mean it, stating to counsel, "Do you think we are criminals or something?"

The other daughter testified to delivering letters for her father to the Prost lady. She said that the arguments between her mother and father arose from his attention to Miss Prost and confirms the fact that these letters were returned to her father in order to patch up the trouble, but that it broke out later.

The father of libellant being recalled stated that he had lived with his son for nineteen or twenty years and when asked upon cross-examination whether he had told a Mrs. Amelia Manzi that he was blaming his son instead of his daughter-in-law for the trouble, answered, "That is impossible. I could give blame to both of them, not one or the other," and that he could neither affirm nor deny what he had said. The libellant stated that he had not recently taken French lessons, except at lengthy intervals because he had become an accomplished scholar. When asked whether he knew where Miss Prost spent her summer of 1931, he said, "I do not." He said he had not visited her any place. He admitted that mail addressed to the French girl sometimes was in his box. The letters were addressed to her in care of him.

A Miss Street was called and testified that she was with Miss Prost at Sanford, Connecticut, in July, 1931,

and that the libellant was with Miss Prost at that place—that he paid a visit to her. This was in direct contradiction of his assertion that he did not know where she was that summer and never visited her in any place where she spent the summer.

Miss Prost was then called by the libellant and stated that she was a French teacher; she could speak French and taught French; the libellant was her student since she met him, and most of the teaching was by mail. She confirms the statement of Miss Street that he visited her in the summer of 1931 at Sanford. He was there two or three days. She says she was not paid for all of the lessons and that he owes her about $200. She knew nothing about the transfer of the life insurance policy until the day before she testified. She came to America in October, 1925, and was going home as soon as possible. At the time she was testifying, she was living in the same house with Mr. Manzi and had been there about four weeks. Her mother, brother and she were all living together in the house and he was a boarder. When asked whether he knew about her using his mail box, she evaded the question and said he never gave her permission. When asked who else she gave French lessons to, she said different ones, but when pressed to give the name of any of them, she said she had forgotten.

This is about the sum and substance of all the testimony. It may be that the relationship between the libellant and this French girl was purely Platonic. We trust it was. But how did it appear to this wife whose love for her husband might make her more liable to be jealous than if she did not care for him? The fact that he deceived his wife as to where he was spending his nights may well be considered in determining how much credence should be given to his testimony. His denial of any knowledge of her where-

abouts during the summer he visited her cannot be accounted for in any other way than that he was endeavoring to conceal the truth.

Taking the whole case, we do not think the libellant has shown that he is entitled to a divorce by such clear and convincing testimony as the law requires. The situation was largely one of his own making. Admitting that his wife was jealous, his prevarication added fuel to the flame. When he persisted in a course of conduct, the existence of which he tried to cover by falsehoods and thus afford the inference of guilt although none may have existed, he could expect from his indignant wife vigorous protests. She was not under these circumstances held to the ordinary language usually employed by married persons in their conversation with one another.

The decree is reversed and the record remitted to the court below with instructions to dismiss the libel; the appellee to pay the costs.