## Dearth *v.* Dearth, Appellant.

Argued May 6, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Paul R. Butler,* for appellant.

*G. Kirby Herrington,* of *Mulvihill, Gollmar & Herrington,* for appellee.

OPINION BY STADTFELD, J., July 20, 1940:

This is an action in divorce by William H. Dearth against Carrie A. Dearth. The grounds set forth in the

346

libel are (1) cruel and barbarous treatment, and (2) indignities to the person. A responsive answer was filed by the respondent. The case was heard in open court before THOMPSON, J., who granted a decree on the ground of indignities.

The parties were married on November 15, 1920. Libellant is a bookkeeper by occupation. The respondent, at intervals during her married life, worked in a department store in Pittsburgh. A home was purchased in March, 1926, and title taken in the names of both parties as tenants by entireties. They have no children.

The relations between the parties were apparently harmonious until the latter part of 1934 or early part of 1935, when a family automobile was purchased. The libellant never learned to drive a car. It was driven entirely by the respondent.

According to the testimony, the libellant was very domestic in his habits and spent most of his evenings at home working in the garden in the proper season and a considerable part of his time in compiling a history of his family. This latter work was carried on in the basement where he had a typewriter and other equipment and the material from which the family history was being compiled. The respondent, on the other hand, after the purchase of the automobile, spent most of her evenings driving the car. The parties naturally drifted apart and the relations became strained. Controversies over money matters arose between them and respondent developed a violent temper. At different times, she threw various objects which happened to be near and beat libellant severely. She would often return from the evening rides at late hours with the odor of liquor on her breath. She, at times, refused to inform her husband where she had been and, at other times, gave untrue information as to her visitations.

About June 11, 1936, libellant learned about respondent's association with one Joseph Jubeck. The latter's

wife called libellant over the telephone and told him that the respondent and Joseph Jubeck were running around together and had been doing so for practically a year previous to that. She said that she was going to have it taken into court. She wanted to bring action to show her up and ruin her reputation if she did not stop. Upon return of libellant's wife that evening, the latter's mother, who had heard the telephone conversation, told her of it. Respondent denied the accusation and stated that if she wanted to go out, she would.

At another time when libellant spoke to respondent of his difficulty in keeping up payments to the building and loan association and taxes and everything in the house, respondent said she would pay the building and loan association the interest on the mortgage. During the conversation, she suggested that Jubeck come and take a room with them and thus help make payments on the house.

A week later, January 19, libellant came home about eleven o'clock. Respondent was working in the kitchen, and her nephew, Harry William Smith, was there. Libellant said, "Harry, did you know your Aunt Carrie has been running around with a married man?" He said, "No, I didn't, Uncle." That made her mad. Libellant testified: "So she kept fighting with me the rest of the evening, and started at me, an electric iron in her hand. Then she started with me with an alarm clock, the only thing that happened to be loose. After we went upstairs I asked Harry William if he knew about it, and he said, 'Yes, I knew about it last summer when I was up here'. Harry William stayed with us every summer after school term. She was afraid I was pumping Harry William for information. When she came up afterwards she started and kept it up until about a quarter to four o'clock, and during that time she tried to get at me, and the only thing I could do was to grab her wrists and keep her away. She couldn't hit me, but she could kick

me; and she did kick me, she kicked me here, and there, and I held her wrists so she couldn't hit me and after that I ran down in the yard. Q. You say she kicked you on the shins then? A. Yes, but that wasn't all. I held her and then she couldn't hit me, but she had her right shoe on and could kick, she kicked me in here, and in the privates once, and I was all skinned, from here down to here. Q. You are indicating from your ankle to your knee? A. Yes; up about a foot, up and down along there. Q. On one leg, or both legs? A. On the right leg. I don't believe the left leg was kicked—it would be the left leg—not the right. She had to use her right leg to kick, and naturally it would be my left. Q. Did she succeed in hitting you with her hand? A. Yes, she did a few times, when I was not looking, she did. I was pretty black where she hit me, and on the side of the face. I know a couple men at the shop where I worked asked me about it."

After libellant learned from Mrs. Jubeck of her accusations against his wife, he observed that his wife was having numerous telephone calls, and that she always gave some excuse, but wouldn't tell who it was if libellant was present when these calls came. At times she would speak to the person at the other end of the line, calling to the party, Stella or Nellie, or some name, and libellant found out it was a man. Libellant then had the telephone company put in extension earphones, so he could hear anything that came in and went out. He heard her make dates.

Libellant further testified: "By Mr. Herrington: Q. You testified a little while ago, Mr. Dearth, that you found out your wife was making dates and keeping company with Joseph Jubeck. Will you tell us whether you ever saw your wife in company with Joseph Jubeck? A. I did, on this particular night I am trying to tell about, the night she tried to put me out of the automobile. That night she went on out to Hazelwood, and

met Mrs. Jubeck. Then she went and got Mr. Jubeck; Mrs. Dearth wanted to have Mrs. Jubeck there and thrash it out; and said we will go down the street and get Joe, and we went down Second Avenue—By Mr. Butler: Q. How do you know she wanted to see Joe? A. She said so,—'I will go get Joe'. Q. Just say what she said, and not what you think she meant. A. I am. She said she would go get Joe, and we would thrash it out right there, all four of us. And she did that, went down on Second Avenue, and I went along, and Joe came back up with us, and all four of us in the car—Q. Who came back up? A. Joe and her and myself. By Mr. Herrington: Q. Wasn't Mrs. Jubeck with you? A. Mrs. Jubeck waited in the car, parked. Q. What else? A. Then we drove over on the little side street, and got off the congested section, and went over this whole thing. Jubeck was denying, and saying there was nothing to it. During this conversation they agreed they were going to stick together—Q. Who would stick together? A. Joe and Mrs. Dearth. By Mr. Butler: Q. Who agreed to that? A. Each one said they would stick to the other. Mrs. Dearth even suggested I might make friends with Mrs. Jubeck, right there in the car. She said, 'You and Marie might make up, and Joe and I will go together, and maybe you and Marie could date up.' Later on then we weren't getting anywhere, and took a ride and went to the Munson Hotel. By Mr. Herrington: Q. Where is the Munson Hotel? A. On Second Avenue, Hazelwood. And I was trying to find out what I could about the meetings; and he said—I said, 'You were out on a certain night at the Lebanon Inn, along with Millie Coleman, and met there', and he said, 'Yes, we were; that was the first I knew Millie'. And Mrs. Dearth opened up and said, 'What is the use lying, Joe; you knew her all along'. During this conversation it was along that same line, that that was the first night they had been out at Lebanon Inn, a drinking

place out from Hays Borough; and Mrs. Dearth said no, you did have a date with Millie; and they met a man named Joseph Trimmer, a Kaufmann employee, whom she worked for. Later on it wasn't getting me anywhere, and not finding out anything more than I really knew already, and I wanted to go home. It was after twelve o'clock then, and I told them we might as well go home, we were not getting anywhere; and they wanted to stay on, and I got up and went home. Q. You mean you went home by yourself? A. I went home by myself. ...... Q. Tell us what happened on July 25th, 1936, that you remember. A. That particular night, one of her many excuses she said she was going to Mrs. Mueller's, so I called Mrs. Mueller and asked if she was there. She said she wasn't there. Q. When did she leave home? A. In the early part of the evening. Q. When did you call Mrs. Mueller? A. I would say about nine or ten o'clock—nine thirty. Q. When did your wife come home? A. Around eleven o'clock. Q. Did she tell you where she had been? A. No, she didn't. Q. Do you know some girl named Jackson? A. There were two sisters named Jackson, worked in the same department at Kaufmann's where she worked, and lived in Wilkinsburg at that time. Q. Do you know anything about your wife visiting there? A. Yes; she told me one time she was going there to visit the two sisters, one evening. Q. Did she go? A. I was there in front of the house, at the number she told me they lived. I stayed around a couple hours and she never came out. Q. When she returned home did she tell you where she had been? A. She did not. Q. Do you know Mrs. Summers? A. I do. Q. Do you recall any occasion that your wife told she was going to visit Mrs. Summers? A. One particular time she said she was going to Mrs. Summers; but the next day I called Mrs. Summers and asked if she had been there, and she said she hadn't been there that particular day at all, or the night before. On

Thursday night she said she was going to Mrs. Summers, and she got back about eleven or half past eleven, and Mrs. Summers—I called Mrs. Summers, and she said she hadn't been there. And the same way with all the other people I called and asked about her being there, and I never found one that said she was there, where she had said she was going. Q. Did you complain to your wife about her conduct and object to the way she was acting? A. Absolutely. Q. How did she react to that? A. She said it was none of my business, she would do as she pleased. She said if I wouldn't go with her she would go alone. Q. How did she express herself? A. Well, she called me all kinds of names, talked about my family, she always called them 'the damn Dearths'. Q. What sort of names did she call you? A. She called me everything, from son-of-a-bitch down. But that particular name she always used for the rest of the family, not particularly me, 'the damn Dearths'. Q. Did she ever tell you she could get a divorce? A. She wanted me to get out of the house and that she could get along without me, she didn't need me, she had plenty of friends. Said she could make her way, but that she wouldn't give me any part in the house, would not sell it or sign any agreement to selling; wouldn't give me any share, but she would stay there and keep the house, and I could do whatever I wanted to; but I couldn't take anything out of the house."

One evening, a constable came to their home and served the respondent with a writ in a prosecution instituted by Mrs. Joseph Jubeck, based on interference on the part of the respondent with the domestic relations of Joseph Jubeck and his wife. This proceeding was later dropped. From that time until the final separation of the libellant and respondent in June 1937, Joseph Jubeck became the center of controversy between the parties. The respondent had frequent meetings with Joseph Jubeck, several of which took place at a drinking

place known as the Lebanon Inn located in Hays Borough and she spent several evenings at this place in company with Joseph Jubeck, a married woman who was one of her acquaintances, and a second man, who was not the husband of either of the women concerned. On this occasion, respondent made the suggestion of the arrangement which has been referred to. Respondent claims that this suggestion was made not by her but by Mrs. Jubeck.

Respondent's mother, who had made her home with the libellant and respondent, died July 2, 1936. After her death, respondent stayed with her brother-in-law for a couple of weeks. Libellant testified, "While there she promised definitely she would never see Joe Jubeck anymore and she would come back home and try to get along, only the two of us. I thought I would give her another chance, thought that she would stop and live up to that, now that there were just the two of us. But she hadn't been back more than a few days when I know she went out with him again."

Respondent humiliated libellant before one particular neighbor. She would say, "there he is, there is the old buck". She called him many vile and opprobrious names. She told him he could leave and get a divorce.

Libellant was corroborated by James L. McAtee, an investigator, and the latter's wife, as to certain visits of the respondent to the Lebanon Inn where she met Jubeck. He was also corroborated by Mrs. Katherine Harrington, a friend, and neighbor of the family for ten years and upwards. She testified that Mrs. Dearth had told her around the holidays in 1936, that she had spent an evening with Jubeck and another couple in Pittsburgh instead of going to Bellaire. She also took Mrs. Harrington with her on several occasions when she met Jubeck and introduced the latter to her.

The respondent in her testimony, denies many of the allegations made by the libellant, but corroborates him

in a number of particulars. She admits going to the home of a woman friend and going with her to the Lebanon Inn in Hays Borough and that she drank there with Joseph Jubeck and another man, whose name is mentioned in the testimony, but states that these meetings with Joseph Jubeck were purely accidental and not prearranged. She admits that a constable came to their home with a writ issued by Mrs. Jubeck and also that she had the daughter of the Jubecks arrested for warning her to stay out of Hazelwood and also admits the meeting at the Munson Hotel between the Jubecks, herself and her husband and the meeting with the priest, who attempted to settle the family difficulties.

Outside of the matters hereinbefore referred to as admitted by respondent, the latter categorically denied the facts to which libellant testified. She produced one witness, a cousin, whose testimony was unimportant insofar as the present controversy is concerned.

The course of conduct amounting to such indignities as would justify a divorce is apparently incapable of specific or of exact definition. Each case must necessarily depend upon its own facts. The principles applicable to the charge of "indignities to the person" have been fully and frequently set forth by this court. It is, of course, impossible to lay down any general rule as to what constitutes such indignities to the person as to render the condition of the injured spouse intolerable and life burdensome; such matters necessarily depend upon all the circumstances of the particular case and the position in life, character and disposition of the parties. It is well settled, however, that it is not with isolated occurrences that the law concerns itself in determining whether a divorce should be granted upon this ground, but only with indignities so repeated and continuous as to constitute a course of conduct which renders the complaining party's condition intolerable and life itself a burden. Such indignities we have fre-

quently said may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient: *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69; *Deutsch v. Deutsch,* 141 Pa. Superior Ct. 339, 14 A. 2d 586.

We quote from the opinion by Judge Orlady in the case of *Breene v. Breene,* 76 Pa. Superior Ct. 568, 573, which correctly sets forth the principles to guide us in the disposition of this and similar cases: "Assuming that each party has offended against the established proprieties that are expected in the marital relation,—even under such unfortunate conditions there must be some point, beyond which human indulgence cannot be expected to submit, and resort to the courts may rightly be had to sever a relation no longer endurable, and which makes a further living together intolerable and life burdensome. To hold that there can be no legal relief from such a deplorable condition would likely result in such physical violence as would jeopardize the life of one of the parties. We are not called upon to balance such an account of mutual delinquencies, but only to determine which party is the least open to the charge of causing the situation."

In *Walker v. Walker,* 109 Pa. Superior Ct. 539, 167 A. 446, this court said, p. 541: "In the absence of a jury trial, we are required to consider all evidence and express an independent conclusion thereon: *Nacrelli v. Nacrelli,* 87 Pa. Superior Ct. 162, 288 Pa. 1, 136 A. 228. The testimony in this case having been taken in open court and the learned judge before whom the witnesses appeared having had an opportunity to observe their manner of testifying and the evidence produced by libellant and his witnesses being clearly sufficient to warrant the entry of a decree appealed from, the find-

ings of fact by the court below are entitled to respectful consideration. 'In the absence of a jury trial the appellate court is required to consider all the evidence and express an independent conclusion thereon. However, where the testimony of the parties to such action is irreconcilably conflicting, the conclusion of the judge who heard them, as to which is to be believed, will not be lightly disturbed on appeal.' *Koontz v. Koontz,* 97 Pa. Superior Ct. 70."

A careful consideration of all the testimony indicates a continued course of conduct on the part of respondent as rendered libellant's condition intolerable and life burdensome. In spite of libellant's frequent protestations, respondent persisted in continuing her association with Jubeck. Our independent examination and consideration leads us to the same conclusion as that of the court below.

The assignment of error is overruled and the decree affirmed.

DISSENTING OPINION BY KELLER, P. J.:

Whatever humiliation libellant suffered was due to his own complaints to his neighbors about his wife's association with Jubeck. If she was guilty of adultery, he should have laid that as ground for divorce; but he evidently realized that his evidence fell far short of the proof necessary for a decree on that ground. Evidence which is suggestive of adultery but is wholly insufficient to warrant a divorce on that ground, is not probative of indignities to the person, and will not justify a divorce for that cause.

This Court said in *Hexamer v. Hexamer,* 42 Pa. Superior Ct. 226, where a divorce was refused in circumstances more favorable to the libellant than in this case, speaking through Judge WILLIAM D. PORTER: "The burden was upon the libellant in this case to establish by evidence the facts which would entitle him to a

divorce for the cause alleged in his libel. He was required to prove that his wife had been cruel to him, had offered indignities to his person, and this burden he could not discharge by proving that his wife had been too kind to other men. The testimony exhibits a state of domestic infelicity, but it does not present a case of cruel and barbarous treatment by the wife of the husband, or indignities to his person, which rendered his condition intolerable and life burdensome, within the meaning of the statute: *Hahn v. Bealor*, 132 Pa. 242. The testimony, it may be conceded, established that the conduct of the respondent with men other than her husband had been indiscreet and such as to arouse the suspicions, or even the jealousy, of the libellant. The pangs of jealousy may have rendered the condition of the husband intolerable and his life burdensome, but for such a result, produced by such a cause, the statutes do not confer upon the courts jurisdiction to decree a divorce."

I would reverse the decree and dismiss the libel.

Judge RHODES joins in this dissent.