Lowe, Appellant, *v.* Lowe.
Lowe *v.* Lowe, Appellant.

Argued December 17, 1941.

Before
KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*Francis T. Anderson,* with him *William A. Gray,* for appellant.

*William Linton,* for appellee.

OPINION BY KELLER, P. J., April 15, 1942:

These two appeals are by a wife from decrees in divorce in favor of her husband. No. 285 is from the decree of the court below dismissing her libel for a divorce from bed and board. No. 286 is from the decree of the same court granting her husband a divorce from the bond of matrimony, on the ground of wilful and

malicious desertion and absence from his habitation, without a reasonable cause, for and during the term and space of two years.

Marshall D. Lowe, Jr. and Kathryn E. Lowe were married in Philadelphia on May 14, 1919, when he was 28 years old and she was 22, and, until the occurrences hereinafter mentioned, lived practically all their married life together in Philadelphia. They have one child, a daughter, who was born June 26, 1922.

On March 4, 1936 she filed her libel, to No. 803 March Term, 1936, asking for a divorce from bed and board on the grounds (1) that by cruel and barbarous treatment, respondent had endangered her life, (2) personal indignities, and (3) malicious abandonment of his family.

On March 9, 1938 he filed his libel, to No. 692 March Term, 1938, asking for a divorce from the bond of matrimony on the grounds, (1) personal indignities, (2) wilful and malicious desertion, without a reasonable cause, since February 11, 1936, and (3) cruel and barbarous treatment, endangering his life.

The cases were referred to a master and were heard together. Fourteen meetings were held beginning May 16, 1939 and ending December 7, 1939, at which 653 typewritten pages of testimony were taken, averaging about 47 pages to a meeting, every meeting but one being in the neighborhood of an hour in length. As we heard these appeals in forma pauperis, because of the alleged poverty of the parties, we think it proper to say that if these cases had been heard by a judge— as is the practice in Allegheny County—and unnecessary and repetitious questioning had been eliminated, they could, in our opinion, have been heard in two days, with a record one-half the present size. If parties can afford to pay the costs of *fourteen hearings before a master* and an unnecessarily extended record of 653 pages of testimony, they should be able to have the record and brief on appeal printed as required by our rules. If masters were required to sit for a full court

day, or even for a full afternoon, and sat from day to day until the case was closed—as would be done if the case was heard before a judge—these unnecessarily extended records would, in all probability, be shortened to a reasonable length, and the parties would be able to comply with our rules of court.

The master in his report found that the charges preferred by the wife in her libel against her husband, were not sustained by the evidence; and recommended that it be dismissed. He also found that the husband had failed to sustain his libel against his wife, as respects the charges of personal indignities and cruel and barbarous treatment, but that the evidence supported his charge of wilful and malicious desertion, without a reasonable cause, since February 11, 1936; and recommended that he be granted a divorce from the bond of matrimony on that ground. Exceptions filed by the wife were dismissed by the court, the report and recommendations of the master were approved and a decree of divorce a. v. m. was entered in favor of the husband on the ground of wilful and malicious desertion; and the wife's libel for a limited divorce was dismissed. The wife appealed as above stated.

We shall not discuss the findings of the master, approved by the court, that the husband had not sustained his charges of indignities to the person and cruel and barbarous treatment for we agree with them in those respects. Nor shall we discuss at length the charges of personal indignities and malicious abandonment of his family preferred by the wife in her libel; although we cannot dismiss the former as cavalierly as the master did. Conduct by a husband with respect to other women, although not sufficient to support a charge of adultery, may be considered as a form of personal indignity to his wife rendering her condition intolerable and life burdensome. See *Manzi v. Manzi*, 112 Pa. Superior Ct. 332, 171 A. 92; *Dearth v. Dearth*, 141 Pa. Superior Ct. 344, 15 A. 2d 37; *Klaus v. Klaus*, 147 Pa.

Superior Ct. 189, 24 A. 2d 33; *Smith v. Smith,* 147 Pa. Superior Ct. 542, 24 A. 2d 660. Although adultery was not charged or proved, the trouble between this husband and wife started about 1929-30 when he began to pay marked attention to another woman, and, despite his wife's protests, continued to do so, at least up to the date of the final separation.

We shall confine our discussion to *her* charge against him of cruel and barbarous treatment, endangering her life, and to *his* charge against her of wilful and malicious desertion without reasonable cause.

He did not prove an *actual* desertion by her, for she never left the common home and habitation; it was he who left the home. He claims, however, that he was put out of the home, at his wife's direction, by the aid of the police, on the early morning of February 11, 1936, and that a few days later, she changed the locks on the doors, thereby preventing his return, and that this, persisted in for a period of over two years, amounted to a *constructive* desertion, entitling him to a divorce.

On the other hand, she avers that following a long period of abuse and cruel treatment on his part, he was, on the early morning of February 11, 1936—(between two and three o'clock A.M.)—guilty of such cruel and barbarous treatment that if she had not escaped from him and run out on a snowy night, barefoot and clad only in her night dress, to her mother's home, eight doors distant, from whence she summoned the police, she would probably have been killed, or, at least, seriously injured, by him in the rage into which he had worked himself; that at her request the police took him away for *the rest of that night,* and that two weeks later, after he had removed his clothes and announced his intention not to come back, on the advice of her attorney she changed the locks on the house.

If her story is the true and correct account of the

occurrence on that night, then she was warranted in having her husband put out of her house, (the title was in her name, subject to a large mortgage), and in changing the locks afterwards so as to keep him out until she was satisfied that she was in no further danger from him; in which event his whole case, based wholly on a constructive desertion, because of the change of locks, would fall, since her action would be justified and not wilful and malicious; and, on the other hand, she would be entitled to a divorce from bed and board by reason of his cruel and barbarous treatment endangering her life.

A careful review of all the evidence leads us to disagree with the master and the learned court below and to accept her story, corroborated as it is in many particulars, as the true account of the occurrence on the early morning of February 11, 1936.

It is well settled that while a charge of cruel and barbarous treatment *may* be established by evidence of such *a course of treatment* as endangers a wife's life or health and renders cohabitation unsafe, it is not essential that a *course of such treatment* be shown; a single act of cruelty may be so severe and with such attending circumstances of atrocity as to justify a divorce: *Krug v. Krug*, 22 Pa. Superior Ct. 572, 573; *Lynn v. Lynn, (No. 1)*, 76 Pa. Superior Ct. 428, 430; *Mentser v. Mentser*, 136 Pa. Superior Ct. 582, 588, 7 A. 2d 541; provided only it endangers her life or warrants a reasonable apprehension thereof, and renders further cohabitation unsafe. See *Sklan v. Sklan*, 110 Pa. Superior Ct. 226, 229, 168 A. 481. It differs, in this respect, from a charge of indignities to the person, which can *never* be established by a *single* act of indignity, but only by proof of such a *course* of conduct or continued treatment as to render her condition intolerable and her life burdensome. *Esenwein v. Esenwein*, 312 Pa. 77, 79, 167 A. 350.

There can be no doubt that if the house had been

his, and following his attack upon her in the early morning of February 11th, she had left him and gone to live with her mother, his conduct that morning and her well-grounded apprehension of serious injury, endangering her life, would have been a complete defense to a libel charging her with wilful and malicious desertion without reasonable cause. The effect of such conduct on her right to live apart from him and not subject to his abuse and cruelty, without being chargeable with wilful and malicious desertion, is not affected by the fact that in this case the house was hers and she was forced to require his withdrawal from it.

The governing facts as we find them from a review of the testimony may be summarized as follows.

Marshall D. Lowe, Jr., is a raw sugar sampler employed by the Franklin Sugar Refinery Company. He is also greatly interested in politics. He served a term as a representative in the General Assembly and has long had political ambitions. After his marriage with Kathryn E. Peifer, they lived with the latter's mother and father for about three years at their home, 1929 Ritner Street. Then they moved to 1942 Fitzgerald Street, a property owned by them by entireties, and lived there for about eight years; and in 1930 or 1931, they moved to 1915 Ritner Street, which was owned by the wife, and lived together there until February 11, 1936.

About 1929-1930 Lowe began associating with a single woman, a school teacher, and from that time on he spent no time at his home except to eat and sleep. For six years before the night of February 10-11, 1936, he had not spent an evening at home, and he recalled of but one time during that period when he had taken his wife and daughter out for an evening. The excuse he gave for his absence from home all these evenings was that his political activities and the social gatherings connected with politics required his absence from home, but he was able to spend evenings at the home of his

school teacher friend, and the evenings of February 11 and February 12, which he says he spent away from home, were spent by him, if his story is believed, at his mother's home and not at political gatherings. He scarcely ever arrived home before midnight and frequently not before two, three or four o'clock in the morning. He drank considerably during these evening meetings and entertainments away from home, and while not enough to interfere with his daily work, it often left him in an ugly temper or disposition when he came home late at night, or in the early morning, when his wife called him so that he would be up in time for his work. Sometimes he would be difficult to rouse in the morning because of the late hour at which he went to bed and his drinking the night before, and once when, as he himself testified (pp. 375-6) he had come home "at two or three o'clock in the morning *under the influence*", he was hard to get up in the morning and she threw some water in his face to waken him, he attacked her and would have hit her with a heavy vacuum sweeper if his daughter had not prevented him. He said, "To get cold water thrown in their face while they are sleeping, I wouldn't vouch for what any one did." But if she hadn't got him up, he would have abused her. The daughter corroborated her mother. He had not only lost all affection for his wife—he said they had not slept together or had marital intercourse for about two years—but he frequently struck her and even kicked and choked her. In 1929, about one or two o'clock in the morning, when he came in the house he met his wife coming from the bathroom with a hot water bag and struck her and threw her downstairs, hurting her so badly that she lay there all night. Once while she was trying to undress him for bed he kicked her in the abdominal region and hurt her badly. While they were living in the Ritner Street house he struck her at least a dozen times and choked her at least twice, and punched her in the breast, when

she tried to get him up in the morning, although he had given her orders that she had to get him up for work, no matter what he did, so that he wouldn't lose his position.

The abusive treatment had become so acute that on Monday morning, February 10, 1936, she consulted William A. Gray, Esq., who, the same day, wrote Mr. Lowe a letter, which he, Lowe, received either Tuesday evening or Thursday evening, stating that Mrs. Lowe had consulted him with reference to her domestic difficulties and suggesting that he call to see him to discuss the matter, or if he preferred, that he refer him to his attorney.

This was the situation when Lowe came home between 2:30 and 3:00 o'clock A.M. the morning of February 11th.

Mrs. Lowe testified that she and her daughter, then nearly fourteen years old, who were alone all evening had gone to bed about 11:30 o'clock. Her husband had left the house immediately after the evening meal. Shortly before three o'clock she was awakened from sleep by hearing noises downstairs, and went down in her nightgown, without putting slippers on her bare feet, and found Mr. Lowe in the dining room. He said he hadn't been able to get into the house, that the door had been locked. She said to him that he had a key to the door, and he said it was locked from the inside and that he had had to get in through the cellar window. He had been drinking and was excited and angry and hit her on the breast with his fist causing her to fall to the floor. When she got up, he grabbed her by the arm and threw her again to the floor, and she then screamed. As she got up—she was screaming for help—he grabbed her by the throat and tried to choke her. The screams wakened her daughter, who was asleep upstairs, and she came down. Her coming apparently eased up the beating and choking and Mrs. Lowe managed to get to the front door, although her

husband tried to stop her. Dressed only in her night-gown and in her bare feet, she ran over the snowy pavements to her mother and rang the bell and was admitted to the house where she telephoned for the police. Her husband had followed her and was on the sidewalk when she entered the home.

When the police came she went back to her home, where she was in a highly nervous, excitable condition and told them to take her husband away *for the rest of the night,* to insure her safety and that of the child. The circumstances and the fear of a scandal which might injure his political prospects, had apparently sobered him, but he left with the police and did not trouble her any more that night.

The daughter corroborated her mother, and testified that as she came downstairs her father had her mother by the throat, her mother was then on the floor and she got her father away and tried to get her mother to a sofa.

"He pushed mother and she tried to run to the window and he ran over to her and threw her across the room and she fell, and she tried to raise herself from the floor and I remember he kicked her again. So, I tried to raise mother from the floor. Daddy had gone in the back, or something, and then mother ran to the door and went down to grandmother's to call the police—no, daddy tried to pull her away from the door. He came back. He didn't want her to go. She ran to the door and was going down to grandma's to call the police." She further testified: "When the police took him out of the house I remember him shaking his finger at my mother and he said 'Don't you come running after me' ".

The family doctor, being summoned, came to see her at seven o'clock that morning. He testified that when he arrived, she was apparently in great pain from her shoulder and was suffering from a nervous shock; she wasn't able to move her arm, due to a strain of the

shoulder muscles and ligaments. There was still a marked redness or bruise on her chest, above the left breast, and at the upper part of the breast itself, and she had some red marks [bruises] on her neck, at her throat, caused, probably, by pressure of the hands, [i. e. choking]; "it couldn't have been made by a fall or rope or anything like that". He summarized his diagnosis as "strain of the left shoulder and arm, and contusion [bruising] of the left chest and breast and *throat*".

Mr. Lowe's explanation of the occurrence was that when he came home, he found the inside door locked with the key inside, and after ringing the bell, without any one coming to let him in, he had crawled in by the cellar window and was in the dining room when his wife came down and "attacked" him, and that he simply held her arms and restrained her—which gave no explanation of the beating and choking which she received, as the wife and daughter testified, and as the marks on her body showed. Mrs. Lowe denied that she had locked the door—said that it was not locked when she opened it to run to her mother's. But even if it was locked, it furnished no excuse for the beating and choking which this woman got.

In our opinion, while, fortunately for him, no serious or permanent injury had been done the wife, the attack, following his prior cruelty and abuse, was so severe as to warrant her leaving him, without subjecting her to a charge of wilful and malicious desertion, and she was fully justified in having him taken away from the house in order that she might be safe from further molestation that night.

He came to the house on Thursday evening and removed all his clothes and announced that he was not coming back. He never made any bona fide offer of reconciliation or attempt to secure a resumption of marital relations. His wife was justified in changing the locks on the house after he announced that he was

not coming back anymore.

Where the stories of the husband and wife conflicted, we accepted the wife's account. It was for the most part corroborated in important particulars. His testimony was so contradictory and unreliable as, in our opinion, to be unworthy of belief. His stories changed from day to day and meeting to meeting. Every time he recounted an event it differed in material respects from the former telling. We think he was glad of an opportunity to be rid of his wife and while he was anxious not to have any notoriety that might injure him politically, he was not averse to the result.

He attempted to ascribe his loss of affection for his wife to her having had a miscarriage about two years before the separation, and by innuendo tried to leave the impression that it had been due to an illegal operation. He was "so provoked", he said, when he heard of it—the miscarriage—that he left. The doctor who attended her said it was a "natural miscarriage ...... I found no evidence of any attempt at criminal abortion" (p. 443). This reveals the manner of man he was.

Neither the master nor the court gave any consideration to the principle which is well established in our law, that where a wife in good faith institutes an action in divorce on the ground of cruel and barbarous treatment, or indignities to the person, causing her to withdraw from her husband's habitation, a libel for divorce filed by him on the ground of desertion will be dismissed where it appears that the time during which her suit was pending was included in computing the two years necessary for a suit for desertion: *Zeiler v. Zeiler*, 58 Pa. Superior Ct. 220; *Sperling v. Sperling*, 82 Pa. Superior Ct. 308. See also, *Gilbert v. Gilbert*, 108 Pa. Superior Ct. 351, 357, 164 A. 103; *Ward v. Ward*, 117 Pa. Superior Ct. 125, 129, 177 A. 515; 41 A.L.R. 271. We find that her action in divorce was instituted in good faith, and under the rule abovestated,

*during its pendency,* her absence from his habitation was not wilful and malicious and therefore not cause for a divorce on the ground of desertion.

In his supplementary report, the master erroneously reported that the husband had been paying his wife $8 per week under an order of support by the *municipal court.* He was paying her *alimony pendente lite* of $8 per week, under an order of the *court of common pleas* entered in her action to 803 March Term, 1936.

Appeal No. 285. The decree is reversed, and the record is remitted to the court below with directions to enter a decree of divorce from bed and board, on the ground of cruel and barbarous treatment, with appropriate permanent alimony, at the costs of the appellee.

Appeal No. 286. The decree is reversed and the libel is dismissed at the costs of the appellee.