Wick,   Appellant, *v.* Wick.

26

Argued March 22, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and JONES, JJ.

*W. A. Blair,* with him *Thomas N. Griggs* and *Griggs, Moreland & Blair,* for appellant.

*Alex A. Garroway,* with him *George Walter Smith,* for appellee.

OPINION BY MR. JUSTICE LINN, April 9, 1945:

The appellant, Margaret Wick, on May 28, 1943, filed her libel in the court of common pleas of Allegheny County praying for a decree of divorce *a mensa et thoro.* She alleged two causes under Section 11 of the Divorce Statute of May 2, 1929, P. L. 1237, 23 PS section 11: (1) cruel and barbarous treatment endangering her life and (2) indignities to the person rendering her condition intolerable and life burdensome. The case was tried

before Judge MCDONALD for several days beginning December 9, 1943. He entered a decree as prayed for on the ground of indignities. There is no evidence to support a decree on the ground of cruel and barbarous treatment. The defendant appealed to the Superior Court which set aside the decree and ordered the libel dismissed. On libellant's petition, we allowed this appeal.

On July 2, 1943, the appellant's husband, George D. Wick, filed his libel in the same court, under section 10 of the statute, praying for a decree *a vinculo matrimonii* on averments of cruel and barbarous treatment and indignities to the person. The case was tried with the trial of her suit against him; his libel was dismissed. He appealed to the Superior Court which affirmed the decree. On his application, we granted leave to appeal.

When these appeals, so allowed, were called for argument in this court, Mrs. Wick moved to quash Mr. Wick's appeal on the ground that, since the trial in the common pleas, Mr. Wick asserted that he had gone to Reno, in the State of Nevada, and procured a decree of divorce; she contended that if he was divorced in Nevada, he was not now entitled to have this court review the action of the courts below refusing a divorce. After hearing argument on the point, her motion was granted; the effect was to vacate the allowance of Mr. Wick's appeal and to leave the order of the Superior Court the final decree in his suit.

We now have for consideration Mrs. Wick's appeal. A libellant's case must be clearly made out to sustain a decree of divorce: *Esenwein v. Esenwein*, 312 Pa. 77, 79, 167 A. 350. In determining which of the oral evidence to accept and which to reject, we lack the advantage possessed by the trial judge who, for several days, had the parties and witnesses before him, with ample opportunity to observe them during the trial. The findings of fact made by him have not the same effect on appeal as the verdict of a jury: *Esenwein v. Esenwein*, 312 Pa. 77, pages 80 and 81, 167 A. 350. Presumably, a trial judge's

opportunity to observe the parties and witnesses during the trial, became the basis of a rule that "When witnesses who are competent and equally interested, flatly contradict each other, the conclusion of the judge who heard them, as to which is to be believed, is not to be lightly disturbed." *Krug v. Krug,* 22 Pa. Superior Ct. 572, 573; *Koontz v. Koontz,* 97 Pa. Superior Ct. 70; *Dearth v. Dearth,* 141 Pa. Superior Ct. 344, 15 A. 2d 37. In accord with that rule, we have at times resolved doubt in dealing with conflicting testimony, by relying on expressed or implied conclusions of the trial judge.

What is sufficient to support a decree under the section of the statute relied on has been variously stated and necessarily includes a wide range of conduct. "It is not of a single act that the law speaks in the clause under which this case falls; but of such a course of conduct or continued treatment as renders the wife's condition intolerable and her life burdensome . . ." *Richards v. Richards,* 37 Pa. 225.

The term "indignities to the person" of a wife as a cause of divorce has been in our law since the Act of September 19, 1785, 2 Sm. L. 343. Experience has shown it to be impossible to embrace in a single definition the great variety of conduct intended to be included in the meaning of the words used by the legislature and at the same time to exclude conduct not within the legislative description. "What is meant by such indignities is left undefined in the law, and depends largely upon the circumstances of each case; they must consist of such a course of conduct as is humiliating, degrading and inconsistent with her position and relations as a wife." *Donnelly v. Donnelly,* 76 Pa. Superior Ct. 92, 95. In *Lowe v. Lowe,* 148 Pa. Superior Ct. 439, 25 A. 2d 781, President Judge KELLER said: "Conduct by a husband with respect to other women, although not sufficient to support a charge of adultery, may be considered as a form of personal indignity to his wife rendering her condition intolerable and life burdensome. See *Manzi v.*

*Manzi,* 112 Pa. Superior Ct. 332, 171 A. 92; *Dearth v. Dearth,* 141 Pa. Superior Ct. 344, 15 A. 2d 37; . . ."

The parties were married in 1914. In December, 1943, when the case was tried, Mrs. Wick was about 50 years of age and Mr. Wick about 54; they have three children, a daughter, Ruth, then aged 16, a son, 19, and a daughter, Kathryn, 23. They have lived in Pittsburgh during their entire married lives.

On July 7, 1942, Mr. Wick left his home and established himself in the Keystone Hotel in Pittsburgh, a hotel that had come under his management as a trustee in bankruptcy and which he reorganized.

In the trial of his suit against his wife, he attempted to prove that her conduct justified his leaving home. The court held that he failed to justify his conduct; the decree dismissing his libel has become a final judgment. We must reject the contention made on behalf of Mr. Wick that his wife "cannot obtain a divorce because she is not an 'innocent and injured' party; she has been guilty of acts which give legal cause for divorce from her." The learned trial judge ruled that Mr. Wick had not proved the indignities alleged in his libel.[1] While the term "innocent and injured spouse" appears in section 10 under which Mr. Wick filed his libel, they do not appear in section 11, under which Mrs. Wick sued.

In the light of the decisions quoted above and others that are familiar, holding or describing certain types of conduct as within the meaning of the statute, we must find, and we all agree in the finding, that the record shows a course of conduct that began just prior to December, 1941, and continued to the time of trial, clearly showing a case supporting the decree made in the common pleas.

There is evidence to show that the parties lived happily from the time they were married in 1914 until

---

[1] Judge McDonald said: "We are not satisfied that the conduct of Mrs. Wick toward Mr. Wick has at any time been such as to render his condition intolerable or his life burdensome."

shortly before December, 1941.[2] There may have been differences such as are said to be usual in matrimonial experience, but none seriously affecting the matrimonial relation.

Mr. Wick had prospered in a worldly sense, coming, as he said, "to this town [Pittsburgh] without a suit," and living, for many years, in a house in which he said he had invested $55,000.00. He was admitted to practice law in 1912 and testified that he was very successful as a lawyer and also in business, having restored to prosperity the Keystone Hotel, of which he was the managing director, and the Fort Pitt Bridge Works, of which he was executive vice president. The president of the Bridge Works, and Mr. Wick, had a common office, and their secretary was Miss Marion Horne. Mrs. Wick first learned of Miss Horne from him and in course of time found occasion frequently to complain of his constant association with Miss Horne. In the course of these discussions, Mr. Wick informed his wife that he no longer loved her, that he had "fallen deeply in love with" another and "would like to have" his freedom. Mrs. Wick was not well, having had several heart attacks, one of which in 1940 kept her under the doctor's care "most of the winter." At the same time and continuously afterward Mr. Wick continued his association with Miss Horne when she was not on duty in the office of the President of the Bridge Works. Mrs. Wick failed in her efforts to dissuade Mr. Wick from the execution of his threats to leave her and obtain a divorce as a result of which (as he threatened) she would have nothing. Early in July, 1943, he left their home and established himself at the Keystone Hotel.

When Mr. Wick first met Miss Horne she lived on the North Side of Pittsburgh in an apartment with Miss

---

[2] We say nothing about the evidence which the court excluded concerning an episode charged against Mr. Wick shortly before his youngest child was born.

Beulah E. Golden. In the management of the Keystone Hotel, Mr. Wick thereafter employed Miss Golden as assistant manager to the auditor. Miss Golden then, with Miss Horne, moved to that hotel. He also employed Miss Dorothy A. Reed as resident manager; she also moved there. Mr. Wick testified that his work at the hotel required him to be there much of the time and to be much in the society of Miss Golden and Miss Reed and that, as Miss Horne also lived there, it was incidental that he should see much of her. Referring to these associations Mr. Wick testified ". . . these people down there have tried to fill the gap, take up part of what I lost when I had to leave home. They have been good to me. . . ." He had his breakfast, as well as other meals, with Miss Horne at the hotel and at times with the other women.[3] He took Miss Horne, sometimes alone, sometimes with one or more of the other women, to clubs, theatres, prizefights and places of resort in or about Pittsburgh and was seen frequently with one or more of them on the street. He took them on vacation trips, paying their expenses. They made two trips to the Hotel Hershey,[4] in Dauphin County, Pennsylvania; they went

---

[3] "Q. Mr. Wick, we will get down to that again. It has been testified to by Miss Golden and Miss Reed that you eat dinner with them regularly? A. That's right. Q. And that Miss Horne is with you at the same time? A. Not always but—Q. Practically every night? A. The four of us generally eat dinner up there. If it happens there is one some place else there are three, and if two are off some place else there are two of us. Q. But you always happen to be in the company of one or two of them practically every night down there? A. Pretty near every evening."

[4] Mr. Wick said: "I took these two girls along with Miss Horne up to Hershey so they would get a chance to look at that hotel. I was there to finish the business I had. I have taken them to these clubs, I have taken them to every hotel in this town that they might see how other hotels are run, how this is handled and how that is handled."

But Miss Horne was not engaged in the hotel business. On one of the trips to Hershey Mr. Wick and Miss Horne were accompanied

to New York City together, to Niagara Falls and to other places. There is evidence that on these trips Mr. Wick occupied a separate room. Mrs. Wick objected to this association, particularly the association with Miss Horne.

Mr. Wick said that Mrs. Wick became hysterical, which, in the circumstances, is no cause for wonder. We may agree, as Mr. Wick intimates, that he had assumed heavy professional and business responsibilities requiring the assistance of others, but it must be recognized that if a spouse assumes responsibilities requiring so much of his or her time and energy as to leave none for the proper continuance of the family life, the offending spouse, and not his or her family, must suffer the resulting legal consequences. Mr. Wick admits this constant association with these women during the entire period and Miss Golden and Miss Reed testified to their and Miss Horne's participation. Miss Horne was not called as a witness. Mr. Wick requested his wife repeatedly to divorce him.[5] When she said she had no

by Miss Ethel Capper who for many years had been employed by the Bridge Works. Miss Capper was not engaged in the Keystone Hotel business.

[5] She testified with respect to one of these occasions: "Q. What did he talk to you about? A. He just tried every way he knew to break me down. . . . I could not begin to tell you all the things he said to me that evening and he kept pestering me for this divorce. Q. Was he gentle about it or what was his manner? A. No, he wasn't gentle about it. He was just very nasty about it and he asked—I said to him: 'What grounds shall I sue for divorce?' 'Oh, you can get it on cruel and barbarous treatment anytime.' I said: 'George, if I do you have to admit Marian Horne. That is the only way you have been cruel to me.' Q. What happened? A. Then he said I could get it on desertion but that would take two years and he did not want to wait that long. Q. In April or May of 1943? A. (continued) In the meantime the Supreme Court decision on divorce came down and when he came out in January to say good-bye to Catherine, she was to move to Kansas City—he spent most of the evening telling me did I realize what that meant, was I going to go now and get the

cause for divorce, he said he would furnish it.[6] Mrs. Wick finally consulted counsel and one result was that this suit was brought. She also sued in equity to restrain him from executing his threats to go to Nevada or elsewhere to obtain a divorce; a preliminary injunction was granted on her bill. Mrs. Wick testified concerning a conversation with Mr. Wick after this suit was brought: "He called me early Sabbath morning and just scolded like everything to me because of the publicity that it had caused and then he insisted that I see Mr. Watkins or some of my friends and do something else, take my action, or he was going to Reno and he was going immediately and I would be left with nothing." While that suit was pending, and, we understand, notwithstanding the injunction, Mr. Wick went to Nevada and, on returning, announced that he had been divorced.

From the time, shortly prior to December, 1941, when the association with Miss Horne alarmed Mrs. Wick, until the disputes on the subject culminated in his leaving his home, and, thereafter, until the trial, Mr. Wick's conduct constituted a continuous series of humiliating and insulting indignities which, the evi-

---

divorce. I said: 'No, I am not going to Reno.' He said: 'Very well, I am.' He said: 'I will get this divorce.'"

Mr. Wick himself testified: "A. No. Mr. Blair, listen: I have suggested to Mrs. Wick on a dozen occasions since 1936 that if two people couldn't get along without this continual dog and cat fighting and keeping each other up at nights and arguing and quarreling all the time, that people of our standing should be decent enough to each other to call it a day and get a divorce and let each other alone. That didn't start in 1940 or '41 or '42 or '43. That has been said to her many times since 1932, which is the date of the Scott incident."

This "Scott incident" is too trivial to merit serious consideration in this case.

6 She testified: "So then he called me and he asked me, he wanted to know now what I was going to do and he started this divorce story all over again. He called two and three times in one evening. I said to him: 'What grounds shall I take for a divorce.' He said: 'I will give you plenty of ground. I will come out there with different women every night.'"

dence shows, made his wife's condition intolerable and her life burdensome within the meaning of the statute. Inter alia, his conduct included his statement that he no longer loved his wife, but had "fallen deeply in love with" somebody else and "would like to have" his freedom; his persistent requests that she obtain a divorce for which he would supply the cause; his threats to divorce her if she did not divorce him; his leaving her; his open and constant association, against her protests, with the women mentioned, particularly with Miss Horne, who, the libellant had reason to believe, was the cause of the trouble. The gossip about Mr. Wick's conduct had grown to the point where his secretary in his law office, whom he called as a witness, became concerned [7] about it as appears from her testimony. Certainly such treatment of a wife is, in the words of the *Donnelly* case, cited above, "humiliating, degrading, and inconsistent with [Mrs. Wick's] position and relations as a wife." It is likewise such treatment as is condemned, as within the statute, in *Lowe v. Lowe,* supra.

Mrs. Artz testified that she had known the Wicks intimately for ten years, had visited them in their home and had seen them at other places. She said she thought

---

[7] Mrs. Wick saw Miss Neuhart in Mr. Wick's room in his law office in 1942 and asked whether she had heard that Marion Horne had "wrecked" her home; Miss Neuhart testified that this was the first she had heard of it. Mrs. Wick was "very hysterical." She was "walking the floor and wringing her hands." Miss Neuhart testified: "Q. And at that time you said you didn't think there was anything to that story, isn't that right? A. Yes. I said to her, 'I don't think there is anything to this.' In fact, Mr. Wick was still there and I turned to him and I said, 'Is there anything to this?' and he said, 'Not a thing.' Q. But later you did admit to her that you were quite concerned about the matter then; that is, sometime after he left home? A. Not so much concerned about the matter as the gossip that was going around. Q. About him running around with these girls? A. About what she was accusing him of. Q. And you were quite concerned about it, weren't you? A. I was neutral all the way through. I didn't take sides."

that ". . . she [Mrs. Wick] was well, a paragon of wives"; "an exceptional housekeeper . . ."; "a wonderful mother." She was asked: "Q. Mrs. Artz, did Mrs. Wick seem to make an effort to please Mr. Wick? A. Oh, in every way. I thought Mr. Wick was catered to by his whole family. I thought he was the center of the pivot on which everything turned; everything seemed to be done for Mr. Wick."

Mrs. Ann R. Friel, who lived next door to the Wicks for many years, testified: "Q. Had you the opportunity to observe how these folks conducted themselves towards each other? A. Well, I would say we were always under the impression, all our family, that they were a most happy couple and a most happy family, very congenial and I would say affectionate. Q. Did you have the opportunity of observing how Mr. Wick acted toward Mrs. Wick during this period of time? A. As I say, they were so happy, so congenial. We never looked for anything else. They sat together in the evening. They had their dinner mostly on the lawn and they and the children were very congenial and very happy. Q. Your house was rather close to theirs, I believe? A. There is just a wire fence between the yards. Q. Do you recall just about the time Mr. Wick left home, that is, in July, 1942? A. Well, not until long after he had left. We never suspected anything. We were very much surprised. We noticed it after it probably had been months after he had left before we knew there was anything, that he had gone at all. Q. Would you have had the opportunity to hear any loud altercations, if they had taken place? A. Well, we were certainly just in the position to hear it but we never had heard of it. Q. At around that time in July, 1942? A. Well, we were around all the time and never heard an angry word or loud word from any one of them."

Mrs. J. C. Septer said she had known the Wicks at least 30 years and had visited their home many times and had seen them at many places, and from her obser-

vation, they were ". . . a most devoted couple, very happy and very affectionate."

Mrs. Minich was described as "the lady who helps Mrs. Wick in her home." Asked about the relations of the Wicks, she said: "A. I always thought they acted very, very lovely. Mr. Wick was always attentive to Mrs. Wick as long as I have been in their employ. Q. How was Mrs. Wick toward him? A. She was very, very attentive to him and always tried to make it pleasant and tried to make things comfortable for him. Q. Did that continue all the time that you were there? A. Yes, it has. I never saw any discord as long as I have been in their employ between Mr. and Mrs. Wick. Q. Did you notice any change in Mrs. Wick at any time? A. I did but I can't just say for sure when. It may have been between two and three weeks before Mr. Wick had gone. Q. What was that change in her? A. It was her attitude. The harmony there was lost in the home. It just seemed like she was grieving, just grieving."

Mrs. Newcomer, a teacher in the Ellis Schools, which their daughters attended, testified. She was asked: "Q. Would you say that Mrs. Wick in any way was indifferent to their development? A. Oh my no! In fact, I think I voiced my appreciation of Mrs. Wick in the fact that she so unstintingly could and did give her attention to her family, her three children; and their home has been a delightful rendezvous for the friends and classmates of both girls as long as I have been connected with the school. It has been outstandingly so. Q. Do you know whether or not Mr. Wick shared the interest in the children? A. Yes, I think he did."

Mrs. Roth, described as ". . . chairman of the nursing committee of the Pittsburgh Chapter of the American Red Cross and also a member of the executive committee," testified that she had visited the Wicks during the last 15 years. "Q. And have you had the opportunity to observe their attitude and their conduct toward each other? A. Yes. Q. And have you observed Mrs. Wick

particularly with respect to her attitude toward her husband? A. Everything seemed to be very pleasant. Q. When were you in the home? A. My husband and I have been guests in their home in the evenings, and also I have been a guest in Mrs. Wick's home in the afternoons."

Mrs. Malone testified that she visited the Wicks within the last few years, and "A. They always seemed very fond of each other, very affectionate toward each other. Q. Were you ever out to the Club with them? A. Yes. Q. Were you ever at dances or parties? A. No, I never was at a dance but I have been to social gatherings with them. Q. And have you had an opportunity to observe Mrs. Wick's attitude toward him on those occasions? A. Yes. Q. And on those occasions or any time you were at the home did you see any evidence of jealousy on her part, in regard to Mr. Wick? A. I never did."

Mr. Artz had opportunities to see them and testified: "Q. Have you ever seen any evidence of jealousy on the part of Mrs. Wick toward Mr. Wick? A. Not that I would really term jealousy. Q. What have you ever seen in the way of discord? A. Maybe just an occasional remark man or wife might make at times as a joke. I took it as a joke anytime it was mentioned. Q. Did you ever see any serious difficulty? A. Not to my knowledge. Q. Did you consider them a normal couple? Q. To such an extent that I was very proud to know them. Q. Did you consider Mrs. Wick a normal, sensible person? A. I would consider her a lovely girl."

Mr. Wick's testimony was to the effect that much of the objectional verbal altercation between himself and his wife occurred after they had retired for the night. Their daughters slept in the adjoining room and during the night a door between the rooms was open. Miss Kathryn Wick, testifying with respect to times when she was not absent at college, was asked: "Q. Did you ever hear them quarreling continuously, as your father said? A. I have never heard of those regular battles that

he described, or any hysteria. There have been discussions and possible disagreements or arguments, something like that, but never any of this loud talking and hysteria that he has described. Q. Did you hear that in 1936? A. No. Q. Or 1937? A. No. Q. Or anytime during the Christmas or spring vacations thereafter? A. I have never heard any of this violent fighting that he has described, and I have heard him say very lovely things to mother. Q. And you had never known of any difficulty between your mother and father during that period of time? A. The first time that I had any inkling of that trouble was when I was in New York. Q. When was that? A. It was just the very end of June. Q. What year? A. 1942. Mother wrote to me— Q. Who? A. Mother wrote to me that Daddy had left home. Q. Was that June or July? A. Well, I am not just exactly sure whether the very end of June or the very first of July. It was either the 29th or 30th of June or the 1st or 2nd of July. I believe it was about the 30th of June I received the letter."

Miss Purdy testified that she had lived across the street from the Wicks for many years and that the families were in and out of each other's houses using the expression "going inners and outers, I would say." She described in detail opportunities of observation and spoke in a complimentary way of both. She heard nothing of any quarreling by them until just before Mr. Wick left. She testified: "Q. What happened when you did hear something in the nature of quarreling coming from the Wick house? A. One night I heard somebody crying over there and crying out 'Daddy, don't leave us, please don't leave us; don't do it; don't do it.' That is all. Q. Who was talking? A. Well, the first night we really weren't sure—we thought it was young Ruth, and George was punishing her or something; that is a neighborhood reaction. Then, another night—a few nights later, the same thing happened, then we knew it was Margaret begging George not to leave."

The marital adjustment of temperaments which had endured more than twenty-five years crashed after the parties passed middle age and the record shows that the conduct of the husband was the legal cause of the disaster. Mrs. Wick's conduct and remonstrances, particularly with respect to Miss Horne, may not always have been in good taste but under the evidence may be considered results rather than causes of her husband's conduct. We consider it unnecessary to discuss the evidence of suggested gas asphyxiation, the use of a revolver, and the threats of reckless driving; the evidence on those subjects was primarily for consideration in Mr. Wick's suit against his wife; as his libel was dismissed, these subjects have only secondary importance in our review of Mrs. Wick's appeal. That evidence may indicate an overstrained nervous condition resulting from defendant's conduct, though for present purposes, it is unnecessary to make definite findings from that evidence.

The order of the Superior Court is reversed; the decree of divorce dated January 22, 1944, entered by the court of common pleas is reinstated and, so reinstated, is affirmed; costs to be paid by defendant, George D. Wick.