## Corso v. Corso

*Jay H. Feldstein* and *Feldstein, Bloom & Grinberg,* for plaintiff.

*A. A. Bluestone,* for defendant.

BROSKY, P. J., May 18, 1972.—Plaintiff, Helen Corso, filed an action in divorce from bed and board against Anthony C. Corso for the reason that defendant has offered such indignities to the person of plaintiff as to render her condition intolerable and life burdensome. On May 2, 1972, the court allowed plaintiff to file the following amendment:

"Plaintiff further avers that in violation of his marriage vow and of the laws of this Commonwealth, the defendant did, on or about July 1, 1970, at Pittsburgh, Pennsylvania, and on several other occasions subsequent thereto, at 1110 North Highland Avenue, Pittsburgh, Pennsylvania, and at various other places in and about Pittsburgh, Pennsylvania commit adultery with one, Ursulla Becker, and at various other times and places, unknown to the plaintiff, did commit adultery with the said Ursulla Becker."

On May 2nd, the court also allowed the preliminary objections theretofore filed by defendant to be considered as having been filed subsequent to plaintiff's amended complaint.

Defendant's preliminary objections are:

"1. The bed and board provisions of the Pennsylvania Divorce Law, 23 P.S. §11, are unconstitutional because they discriminate between the sexes.

"2. Said provisions being unconstitutional, this

court lacks jurisdiction of the subject matter herein as well as the parties hereto."

This court will review the history of divorce in Pennsylvania generally, a bed and board divorce in particular, as well as the historical background that led to the constitutional amendments in both this Commonwealth and the United States.

## I. ORIGIN AND NATURE OF DIVORCE FROM BED AND BOARD

The church considered marriage a sacrament which was indissoluble by human authority. Absolute divorce, therefore, was forbidden. Husband and wife were not permitted to live apart, even by agreement. The ecclesiastical court compelled the absent spouse to resume cohabitation by its decree for the restitution of conjugal rights. Where, however, the marriage vow was broken by adultery or acts of cruelty rendered further cohabitation unsafe, the innocent spouse was permitted, by judicial decree, to live apart from the wrongdoer. This relief was afforded by a decree of judicial separation, called divorce a mensa et thoro, or divorce from bed and board. The decree of divorce a mensa et thoro does not sever the marital tie and the parties still remain husband and wife.

Blackstone, Book 1, Chapter 15, page 440, said:

"II Dissolution of Marriage. I am next to consider the manner in which marriages may be dissolved; and this is either death, or divorce.

"Divorce. There are two kinds of divorce, the one total, the other partial; the one *a vinculo matrimonii* [from the bond of matrimony], the other merely *a mensa et thoro* [from bed and board].

"The total divorce, *a vinculo matrimonii*, must be for some of the canonical causes of impediment before

mentioned, and those existing *before* the marriage, as is always the case in consanguinity; *not supervenient, or arising afterwards;* as may be in case in affinity or corpora imbecility. For in cases of total divorce, the marriage is declared null, as having been absolutely unlawful *ab initio;* and the parties are therefore separated *pro salute animarum* [for the welfare of their souls]: for which reason, as was before observed, no divorce can be obtained, but during the life of the parties. The issue of such marriage as is thus entirely dissolved, are bastards. "Divorce *a mensa et thoro* is when the marriage is just and lawful *ab initio,* and therefore the law is tender of dissolving it; but, for some supervenient cause, it becomes improper or impossible for the parties to live together: as in the case of intolerable ill temper, or adultery, in either of the parties. For the canon law, which the common law follows in this case, deems so highly and with such mysterious reverence of the nuptial tie, that it will not allow it to be unloosed for any cause whatsoever, that arises after the union is made. And this is said to be built on the divine revealed law, though that expressly assigns incontinence as a cause, and indeed the only cause, why a man may put away his wife and marry another. The civil law, which is partly of pagan origin, allows many causes of absolute divorce and some of them pretty severe ones. . . ."

## II. CRITICISM OF A BED AND BOARD DIVORCE

The continued existence of the remedy of divorce a mensa et thoro, notwithstanding the disappearance of the causes for its rise, has invited severe just criticism. Bishop (Law of Marriage and Divorce, Freedman, vol. 2, sec. 354) describes it in words of extreme condemnation:

"When the Church governed this entire subject of marriage, and forbade judicial dissolution as an interference with the sacrament, competent only for its earthly head the Pope, it gave to the courts the right to make the enforced separation and practical celibacy permanent; and thus perpetuate the wrong, by pronouncing a decree of what was termed divorce from bed and board. By this decree, the injured party, in mockery of redress, is kept under all the burdens of matrimony, and cut off from all its benefits. At the same time, it enables the law to put on the delusive appearance of carrying out the boast that it furnishes a remedy for every wrong.

"This proceeding, neither dissolving the marriage, nor reconciling the parties, nor yet changing their natures, having, at least, no direct sanction from Scripture; characterized by Lord Stowell as casting them out in the undefined and dangerous characters of a wife without a husband, and a husband without a wife; [*Evans v. Evans*, 1 Hagg. Cons. 35, 119, 161 Eng. Rep. 466, 496 (1790)] by Judge Swift, as 'placing them in a situation where there is an irresistible temptation to the commission of adultery, unless they possess more frigidity or more virtue than usually falls to the share of human beings'; [1 Swift's System, 193] by Mr. Bancroft, as punishing 'the innocent more than the guilty'; [Bancroft's Hist. U.S. 465] by an English writer, as 'a sort of insult, rather than satisfaction, to any man of ordinary feelings and understanding'; [Macqueen, Husband and Wife, 197] — is, while destitute of justice, one of the most corrupting devices ever imposed by serious natures on blindness and credulity. It was tolerated only because men believed, as a part of their religion, that dissolution would be an offence against God; whence the slope was easy toward any compromise with good sense; and as the

fruit of compromise we have this ill-begotten monster of divorce a mensa et thoro, made up of pious doctrine and world stupidity. . . . Yet in the face . . . of all opinions not moulded by theological dogma, Protestant England, and a large proportion of the States of this country where the tenets of no particular religious sect pervade our legislation, this divorce from bed and board, termed in the modern English statutes judicial separation, this nuisance in the law, is suffered to stand unquestioned! Even in Scotland it exists; in almost every place where Marriage is known, this Folly walks with her, — the queen and the slut, the pure and the foul, the bright and the dark, dwell together! Such is marriage and its detestable part, such is human life!: Bishop, Marriage Divorce & Sep. (1891: Secs. 67-8).

"So contrary to nature is this strange remedy of divorce, which leaves the parties still bound to each other, that Chancellor Kent wisely recommended that decrees of divorce *a mensa et thoro* contain an admonition to the spouses that they refrain from acts of adultery. In Barrerre v. Barrerre [4 Johns. Ch. (N.Y.) 187, 195-96 (1819)] that eminent judge said: 'The canon law, with a paternal solicitude, well worthy of adoption, requires that a monition be inserted in all sentences for a divorce, *a mensa et thoro*, that the parties must live chastely, and that neither of them, during the life of other, can contract marriage with any other person.' In entering the decree of divorce *a mensa et thoro*, he therefore included this clause: 'And it is hereby declared to be the duty of each of them to live chastely during their separation, and that it will be criminal, and an act void in law, for either of them, during the life of the other, to contract matrimony with any other person.' [Barrere v. Barrere 4 Johns. Ch. (N.Y.) 187, 198 (1819)]."

## III. GROUNDS FOR DIVORCE FROM BED AND BOARD

The Act of May 2, 1929, P.L. 1237, sec. 11, 23 PS §11, its supplements and amendments, provides:

"Upon complaint and due proof thereof, it shall be lawful for a wife to obtain a divorce from bed and board, whenever it shall be judged, in the manner hereinafter provided in cases of divorce, that her husband has:

"(a) Maliciously abandoned his family; or

"(b) Maliciously turned her out of doors; or

"(c) By cruel and barbarous treatment endangered her life; or

"(d) Offered such indignities to her person as to render her condition intolerable and life burdensome; or

"(e) Committed adultery."

## IV. PRIOR ACTS OF ASSEMBLY

The first general statutory provision for divorce in Pennsylvania was the Act of September 19, 1785, 2 Sm. L. 343. This statute authorizing divorce from bed and board for any of the causes, except marriage on false rumor of death, made ground for divorce from the bonds of matrimony, i.e., impotence, bigamy, adultery and desertion for four years. In addition, a wife was entitled, under this statute, to a divorce from bed and board with alimony where the husband maliciously abandoned his family, or turned his wife out of doors, or was guilty of cruel and barbarous treatment or indignities to the person.

The law relating to marriage and divorce was recodified by the Act of March 13, 1815, P.L. 150, 6 Sm. L. 286, which repealed the Act of 1785. *The Act of 1815, supra, made no provision for divorce from bed and board.* This singular omission was supplied by the Act

of February 26, 1817, P.L. 67, 6 Sm. L. 405, which authorized divorce from bed and board in favor of a wife whose husband maliciously abandoned his family, or maliciously turned his wife out of doors, or was guilty of cruel and barbarous treatment or indignities to the person. *Between 1815 and 1817, however, there was no right to divorce from bed and board.* The Act of 1815, which repealed the Act of 1785, contained a proviso that pending proceedings should not be affected by such repeal and should be concluded pursuant to the provisions of the new statute. It was, therefore, held that a suit for divorce from bed and board commenced under the Act of 1785 and pending at the enactment of the Act of 1815 was governed by the new law. There could be no decree of divorce from bed and board entered in such proceedings, because the Act of 1815, although requiring the pending suit to be proceeded with under its terms, made no provision for such a decree.

Smith v. Smith, 3 S. & R. 246, at page 248 (1817), Tilgman C. J. said:

"The act which was passed at the last session of the legislature does not affect this case. It restores the power of divorcing from bed and board and giving alimony, but has no retrospect."

The Act of 1817, as amended and supplemented, continued to be the law until 1929, when the Divorce Law was enacted: Act of May 2, 1929 P.L. 1237, 23 PS §§1, et seq. The Divorce Law made little change in the substance of prior laws. Its purpose was to codify and restate the then existing laws relating to divorce. It refers to divorce a mensa et thoro as divorce from bed and board, and restates the grounds for such divorce as they had previously existed. It specifically requires a turning out of doors to be malicious. By the amendment of May 25, 1933, P.L. 1020, sec. 46, 23 PS §46, of

the Divorce Law, providing for alimony pendente lite and counsel fees and expenses, was specifically extended to suits for divorce from bed and board.

## V. STATUS OF MARRIED WOMEN

Given the traditional social and economic view that woman's place was in the home, it is not surprising that laws affecting domestic relations have defined women's rights and duties with great specificity.

At common law, a woman who married became a legal nonperson, a feme couvert.

Blackstone, Book 1, p. 442, states:

"By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection and *cover,* she performs everything; and is therefore called in our law—french a *feme-couvert, faemina viro co-operta;* it is said to be *covert-baron,* or under the protection and influence of her husband, her *baron,* or lord; and her condition during her marriage is called her *coverture.* Upon this principle, or a union of person in husband and wife, depend almost all the legal rights, duties and disabilities, that either of them acquire by the marriage."

Statutory developments in the nineteenth and early twentieth centuries tended to frame a more dignified but nevertheless distinct and circumscribed legal status for married women. At the present time, domestic relations law is based on a network of legal disabilities for women, supposedly compensated by a corresponding network of legal protections. The law in this area treats women, by turns, as mental incompetents and as more mature persons than men of

the same age; as valuable domestic servants of their husband and as economic incompetents; as needing protection from their husbands' economic selfishness and as needing no protection from their husbands' physical abusiveness. In many respects, such as name and domicile, the law continues overtly to subordinate a woman's identity to her husband's.

Much of the national discussion about women's status has focused on marriage and divorce laws, and rightly so, because the issues involved are important to people personally, and because women's domestic role has traditionally been considered their primary one. Unquestionably, the trend in marriage and divorce law is in the direction of treating the spouses equally or on the basis of their individual capacities. Progressive present-day models for change in the area of family law eliminate virtually all differentiation on the basis of sex. Thus, in most instances, the effect of the Equal Rights Amendment on marriage and divorce law will be to move the law more directly, more forcefully and more expeditiously in the direction it is already going.

In considering the impact of the Equal Rights Amendment on some aspects of domestic relations law, we must keep in mind the law's limited power to predetermine and control the nature of intimate personal relationships. In the realm of marriage and the family, social customs, economic realities, and individual preferences have a far greater influence on behavior than the law.

## VI. ALLOCATION OF DUTY OF FAMILY SUPPORT BETWEEN HUSBAND AND WIFE

The statutory requirements for a lawful marriage are generally very simple. They include in most States a

valid license, a waiting period before issuance of the license, a medical certificate, proof of age, parental consent for parties below the age of consent, and a ceremony of solemnization. Of these, only age requirements for marriage with and without parental consent involve widespread discrimination on the basis of sex. A 1967 survey of State marriage laws by the United States Department of Labor showed that only ten States set the same minimum age for marriage (age below which marriage, even with parental consent, is prohibited) for men and women. Pennsylvania is one of 18 States that set the same age of consent, age at which marriage is permitted without parental consent, for both men and women.

In Pennsylvania, the entire Volume 48, Purdon Statutes, is concerned with the following: (1) Marriage Law, (2) Substantive Rights of Married Women, and (3) Remedies and Liabilities of Married Women, among other things.

The Act of May 23, 1907, P.L. 227, and its amendments, 48 PS §131, pertains to actions for support and maintenance, wherein only the *wife* may bring an action for support. In a proceeding for support of the wife, it was held the husband is under legal obligation to support his wife even though she is possessed of individual means.

In Commonwealth v. Liuzzi, 142 Pa. Superior Ct. 239, the court said, at page 241:

"The fact that the relator is gainfully employed does not deprive her of her right to support by her husband; that duty is imposed upon him by law; Commonwealth ex rel. Shotz v. Shotz, 130 Pa. Superior Ct. 561, 198 A.472. The amount of a wife's separate earnings is, however, one of the relevant circumstances to be considered in fixing the amount of an order."

The Act of June 24, 1939, P.L. 872, sec. 733, its amendments and supplements, 18 PS §4733, makes it a crime if the husband or father neglects to maintain his wife or children.

It thus appears that article I, sec. 27, of the Constitution, as amended, abolished the matter of the substantive rights, remedies and liabilities of women for support, and prohibits them from sharing in the property of the husband. This court will discuss the effective date and the retroactive effect of this amendment later in this opinion.

Apparently, the only future legal remedy for the care of an indigent wife are the "Poor Laws" of Pennsylvania as provided by the Act of June 24, 1937, P.L. 2045, as amended, 62 PS §1973, et seq.

## VII. EQUAL JUSTICE UNDER THE LAW

The motto carved on the marble pediment of the United States Supreme Court Building proclaims "Equal Justice Under Law." How then can women secure "equal justice under the law" if the husband has complete control over his wife's property, the products of her labors and the property acquired during coverture in the name of the husband alone? The alimony laws of Pennsylvania should be rewritten to grant special protection to a spouse who has been out of the labor force for a long time in order to make a noncompensated contribution to the family's well being. The law should provide for parental function, marital contribution and ability to pay rather than the sex of the spouse.

New York Law Forum, vol. 17, p. 539 (1971), discusses the need for needed legal reform of married women's status and property rights:

"The Uniform Marriage and Divorce Act promulgated

in August, 1970, by the prestigious National Conference of Commissioners on Uniform State Laws after long study by eminent constitutional scholars who make up its membership, is a tremendous step toward needed legal reform of married women's status and property rights. It is to be hoped that the stamp of approval given by the American Bar Association will accelerate adoption of the provisions by the states. The Act provides that upon dissolution of marriage, the marital property shall be divided by the court without regard to marital misconduct, after considering such relevant factors as the economic circumstances of each spouse and the contribution of each to the acquisition of the marital property, including valuation of the contribution of a spouse as homemaker. Alimony, as such, is discarded in favor of court-assessed "maintenance payments" which may be assessed against either husband or wife, based upon reasonable needs and ability to support himself or herself by employment. The court may order either or both parents to pay reasonable amounts for support of a child and retain control over the enforcement of payment. The Act would abolish previous defenses of condonation, connivance, collusion, and recrimination in divorce actions. The grounds for divorce, to be decided upon by the court after considering many outlined relevant factors, are that 'the marriage is irretrievably broken' and that children are in some manner provided for. This proposed Act fully embraces the concept of equality of rights under the law. . . ."

The Equal Rights Amendment should fortify and hasten the adoption by all States of remedial legislation.

The Ninety-second Congress of the United States of America, on March 22, 1972, by 84 votes yea and eight votes nay, adopted the following:

"Joint Resolution—Proposing an amendment to the Constitution of the United States relative to equal rights for men and women:

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein), That

The following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

### "Article —

"Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex."

Although the proposed constitutional amendment to the Constitution of the United States relative to equal rights for men and women has not, as of this writing, been approved by three-fourths of the several States, the statements made by the eminent statesmen of both Houses of Congress, prior to the adoption of the "Joint Resolution," supra, pointed up the necessity for the adoption of the said amendment and especially points up the wisdom of the Legislature of Pennsylvania in submitting a Pennsylvania constitutional amendment to the voters.

The Joint Resolution (H.J. Res. 208) proposing an amendment to the Constitution of the United States relative to equal rights for men and women was discussed for more than 47 years by members of both Houses. Reading of the arguments by many able statesmen, in the Congressional Record and, in par-

ticular, the Session of March 22, 1972, commencing on page 4,558 sets forth the arguments of the respective Senators. The Hon. Mr. Brooke said, commencing at page 4,560:

"Mr. BROOKE (Honorable Senator from Massachusetts). Mr. President, I support House Joint Resolution 208, the equal rights amendment, presently before us, and believe it should be promptly passed without qualification or change.

"The amendment — in 24 simple words — 'Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex,' gives the women of this country the personal magna carta they have sought for so long. They seek nothing more than equality. They deserve no less."

The Hon. Mr. Stevenson (Illinois) said, at 4561:

"The principle is that sex, by and of itself, cannot be used as a classification to deny or abridge any person of his or her equal rights under the law. This, of course, is more than a mere negative statement that henceforth there can be no legally sanctioned discrimination against women. The amendment should accomplish that, but it will do more. It will tell the Federal Government and the governments of the several States that in all their laws they must set up reasonable distinctions and qualifications based not on the overbroad categorization of sex, but rather on the characteristics of individuals."

Mr. Erwin, the eminent lawyer and Senator from North Carolina, presented the "Minority View" commencing on page 4,573 of the Congressional Records, supra. Commencing on page 4,576, he said:

## "X. DOMESTIC RELATIONS LAWS

"The common law and statutory law of the various

states recognized the reality that many women are homemakers and mothers, and by reason of the duties imposed upon them in these capacities, are largely precluded from pursuing gainful occupations or making any provision for their financial security during their declining years. To enable women to do these things and thereby make the existence and development of the race possible, these state laws impose upon husbands the primary responsibility to provide homes and livelihoods for their wives and children, and make them criminally responsible to society and civilly responsible to their wives if they fail to perform this primary reponsibility. Moreover, these state laws secure to wives dower and other rights in the property left by their husbands in the event their husbands predecease them in order that they may have some means of support in their declining years.

"If the Equal Rights Amendment should be interpreted by the Supreme Court to forbid any legal distinctions between men and women, it would nullify all existing and all future laws of this kind."

Professor Paul Freund, of the Harvard Law School, and Professor Phil Kurkland, of the Chicago Law School and Editor of the Supreme Court Review, share the same view to the "Equal Rights Amendment," in that they are both opposed to it.

A New York Times article, opposed to the "Equal Rights Amendment," construed the decision to mean that:

"The effect of this ruling is to place the fate of various sexually discriminatory laws on a case by case basis. This is a slower but preferable way to correct the evils of discrimination than the passage of the proposed equal rights amendment."

Excerpts from the majority report of the Committee on the Judiciary on the Equal Rights Amendment

was made part of the Congressional Record, supra, by the Hon. Mr. Bayh and, by reason of its length, we will not quote therefrom.

The Hon. Mr. Percy, Senator from Illinois, said, at page 4,609 (Congressional Record, March 22, 1972):

"Where discrimination has been less overt, we have imposed on women certain responsibilities that make it impossible for them to achieve equality. Marriage and divorce laws are primary examples of this.

"Married women may by law expect in many instances nothing more than their husbands decide to give them. Once the marriage has been dissolved, a woman ordinarily has custody of the couple's children making it difficult if not impossible for her to work outside the home, although she must also assume the major responsibility of supporting those children. Statistics on alimony and child support, which I have entered into the record, indicate that 1 year after the divorce only 38 percent of the fathers are in compliance with courts' support orders. After 10 years, only 13 percent are in compliance. What this means is that women, under the concept of maternity rights, must physically care for the children and assume the financial responsibility of earning a living for them as well."

We do note, however, over 54 organizations supported the amendment. Another article supporting the constitutional amendment entitled "Women are Constitutional Outcasts" from "The Woman Physician", official publication of the American Medical Women's Association, vol. 26, December, 1971, also appears in the March 22, 1972, Congressional Record commencing at page 4,587.

We also commend the following cases that discuss the important cases as excluding women from equal protection which necessitated the constitutional amendments:

1. Bradwell v. Illinois 83 U.S. 130 (1872); In re Lockwood 154 U.S. 116 (1894).

2. Yick Wo v. Hopkins, 118 U.S. 356 (1886).

3. Takahashi v. Fish & Game Commission, 334 U.S. 410 (1948).

4. Muller v. Oregon, 208 U.S. 412 (1908). Sixty years later, in Mengelkoch v. Industrial Welfare Comm., 284 F. Supp. 950 (C. D. Calif.), the court commented: "It was in Muller v. Oregon that Louis Brandeis . . . submitted his famed brief containing medical and socio-economic data to establish the reasonableness of the state classification by sex. . . ." [a brief used in many types of litigation] Mr. Felix Frankfurter represented the State in a later case of Bunting v. Oregon, thus solidifying the doctrine of excluding women from 14th Amendment equal protection. (Shepardizing shows in excess of 90 cases which Muller v. Oregon, supra, were discussed.)

5. Goeseart v. Cleary, 335 U.S. 464 (1948) (Michigan Law); Paterson Tavern & Grill Owners Assn. v. Hawthorne, 270 A. 2d 628 (N. J. Superior Ct. 1970).

6. Weeks v. Southern Bell Tel. & Tel. Co., 408 F. 2d 228 (Calif. 5, March 4, 1969) reversing 277 F. Supp. 117 (S. D. Ga., 1968).

7. Bowe et al. v. Colgate-Palmolive Co., 416 F. 2d 711 (C.A. 7, 1969), reversing 272 F. Supp. 332 (S. D. Indiana, 1967).

8. Leah Rosenfeld v. Southern Pacific Co., 293 F. Supp. 1219 (C. D. Calif., 1968); Caterpillar Tractor Co. and Illinois Bell Tel. & Tel. Co. v. Grabiec, 317 F. Supp. 1304 (S. D. Ill., 1970).

9. Mengelkoch v. Industrial Welfare Comm., 284 F. Supp. 950 (C. D. Calif., 1968) review denied, case remanded, 393 U.S. 83 (1968).

10. Cohen v. Chesterfield County School Board, 326 F. Supp. 1159 (E. D. Va., 1971); La Fleur et al. v.

Cleveland Board of Education, 326 F. Supp. 1208 (N. D. Ohio, 1971).

11. Ida Phillips v. Martin Marietta Corp. (Jan. 25, 1971), remanding 411 F. 2d 1 (C.A. 5, 1969) and 416 F. 2d 1257.

12. Missouri ex rel. Gains v. Canada, 305 U.S. 337 (1938).

13. Allred v. Heaton, 336 S. W. 2d 251 (Tex. Civ. App., 1960) cert. den. 364 U.S. 517.

14. Kirstein v. Rectors & Visitors of U. of Virginia, 309 F. Supp. 184 (E. D. Va., 1969); Williams v. Mc-Nair, 316 F. Supp. 134 (D. C. S. Car., 1970).

15. The Women's Equity Action League (WEAL), Cleveland, Ohio, organized in 1967, has filed complaints in Office of Federal Contract Compliance of Dept. Labor, and to Secretary, Health, Education and Welfare, pursuant to Ex. Order 11375, forbidding sex discrimination by government contractors.

16. U. S. ex rel. Carrie Robinson v. York, Supr., 281 F. Supp. 8 (D. C. Conn., 1968); Commonwealth v. Daniel et al., 430 Pa. 642, 243 A.2d 400 (1968), 210 Pa. Superior Ct. 156.

17. Texas Penal Code, art. 1220 and annotated cases.

18. Reed v. Reed, 465 P. 2d 635 (Idaho Superior Ct., 1970) cert. gtd. Oct. term, 1970, no. 430.

## VIII. IS THE EQUAL RIGHTS AMENDMENT NECESSARY IN VIEW OF THE 14TH AMENDMENT

Honorable Mr. Ervin said, page 4,573:

"A good case can be made for the proposition that it is not necessary to resort to a constitutional amendment to abolish state laws which make unfair discriminations between men and women in employment or

any other sphere of life. This argument rests upon the Equal Protection Clause of the Fourteenth Amendment which prohibits states from treating differently persons similarly situated, and is now being interpreted by the courts to invalidate state laws which single out women for different treatment not based on some reasonable classification.

"To be sure, the Equal Protection Clause may not satisfy the extreme demands of a few advocates of the Equal Rights Amendment who would convert men and women into beings not only equal but alike, and grant them identical rights and impose upon them identical duties in all the relationships and undertakings of life.

"It cannot be gainsaid, however, that the Equal Protection Clause, properly interpreted, nullifies every state law lacking a rational basis which seeks to make rights and responsibilities turn upon sex.

"My view is shared by legal scholars. Their views on this subject are succinctly expressed by Bernard Schwartz in his recent commentary on the Constitution of the United States which declares 'that a law based upon sexual classification will normally be deemed inherently unreasonable unless it is intended for the protection of the female sex.'

"The best example of the Supreme Court's willingness to use the 14th Amendment to strike down laws which discriminate against women, thus rendering the ERA unnecessary, is the case of Reed v. Reed": 40 L. W. 4013 (1971).

## IX. HISTORICAL POSITION FOR EQUAL RIGHTS OF WOMEN

The Yale Law Journal, vol. 80, pages 871, et seq., contains a scholarly article for equality of women in support of the proposed Federal constitutional amend-

ment. The discussion and comments are also applicable to the Pennsylvania amendment, which was adopted and approved subsequent to the writing of the article.

This court has quoted and paraphrased applicable portions thereof.

"The basic principle of the [Pennsylvania] Equal Rights Amendment is that sex is not a permissible factor in determining the legal rights of women, or of men. This means that the treatment of any person by the law may not be based upon the circumstance that such person is of one sex or the other. The law does, of course, impose different benefits or different burdens upon different members of the society. That differentiation in treatment may rest upon particular characteristics or traits of the persons affected, such as strength, intelligence, and the like. But under the [Pennsylvania] Equal Rights Amendment the existence of such a characteristic or trait to a greater degree in one sex does not justify classification by sex rather than by the particular characteristic or trait. Likewise the law may make different rules for some people than for others on the basis of the activity they are engaged in or the function they perform. But the fact that in our present society members of one sex are more likely to be found in a particular activity or to perform a particular function does not allow the law to fix legal rights by virtue of a membership in that sex. *In short, sex is a prohibited classification.*" (Italics supplied.)

Sex is an inadmissible category by which to determine the right to a minimum wage, the custody of children, the obligation to refrain from taking the life of another, and so on.

*"This basic principle of the [Pennsylvania] Equal Rights Amendment derives from two fundamental judgments inherent in the decision to eliminate dis-*

*crimination against women from our legal system."* (Italics supplied.)

Equality of rights means that sex is not a factor. This at least is the premise of the Equal Rights Amendment. And this premise was no doubt the intention of the Pennsylvania Legislature in passing the joint resolution for the adoption of the amendment.

"We believe that the Equal Rights Amendment, . . . furnishes a viable structure for achieving equality of rights for women. The basic proposition—that differences in treatment under the law shall not be based on the quality of being male or female, but upon the characteristics and abilities of the individual person that are relevant to the differentiation—is founded in the fundamental values of our society."

As a matter of constitutional mechanics, therefore, the law must start from the proposition that all differentiation is prohibited.

## X. SIGNIFICANT EXCERPTS IN THE AREA OF DOMESTIC RELATIONS

Significant excerpts from 80 Yale Law Journal, supra, which is supported by the proponents of the ERA in the area of domestic relations are as follows:

1. "The Equal Rights Amendment, continuing this trend, would prohibit dictating different roles for men and women within the family on the basis of their sex" page 953.

2. "Thus, common law and statutory rules requiring name change for the married women would become legal nullities": page 940.

3. "These states could conform to the Equal Rights Amendment by requiring couples to pick the same last name, but allowing selection of the name of either

spouse, or of a third name satisfactory to both": page 940.

4. "The Amendment would also prohibit the states from requiring that a child's last name be the same as his or her father's, or from requiring that a child's last name be the same as his or her mother's": page 941.

5. "In ninety per cent of custody cases the mother is awarded the custody. The Equal Rights Amendment would prohibit both statutory and common law presumptions about which parent was the proper guardian based on the sex of the parent": page 953.

6. ". . . physical capacity to bear children can no longer justify a different statutory marriage age for men and women": page 939.

7. ". . . mere estimates of emotional preparedness founded on impressions about the 'normal' adolescent boy and girl are based on the kind of averaging which the Equal Rights Amendment forbids": page 939.

8. "The Equal Rights Amendment would not permit a legal requirement, or even a legal presumption, that a woman takes her husband's name at the time of marriage": page 940.

9. "A court would do away with the rule that refusal to accompany or follow a husband to a new domicile amounts to desertion or abandonment": page 942.

10. "A husband would no longer have grounds for divorce in a wife's unjustifiable refusal to follow him to a new home": page 942.

11. "The traditional rule is that the domicile of legitimate children is the same as their father's . . . The Equal Rights Amendment would not permit this result": page 942.

12. "In all states husbands are primarily liable for the support of their wives and children . . . the child support sections of the criminal non-support laws . . .

could not be sustained where only the male is liable for support": pages 944-45.

13. "The Equal Rights Amendment would bar a state from imposing greater liability for support on a husband than on a wife merely because of his sex": page 945.

14. "Two different systems have been adopted in the United States for distributing property rights within a family—the community property system and the common law system . . . As both systems currently operate, they contain sex discriminatory aspects which would be changed under the Equal Rights Amendment": page 946.

15. "Under the Equal Rights Amendment, laws which . . . favor the husband as manager (of community property) in any way, would not be valid": page 947.

16. "All states except North Dakota and South Dakota give the woman a nonbarrable share in her husband's estate, but a number of states fail to give the husband a corresponding legal claim in his wife's estate . . . the discriminatory laws would either be invalidated or extended": page 948.

17. "A court could invalidate (many grounds for divorce) without doing any serious harm to the overall structure of the state's divorce law . . . (These are) pregnancy by a man other than husband at time of marriage, nonsupport, alcoholism of husband, . . . unchaste behavior, husband's vagrancy, wife's refusal to move with husband without reasonable cause, wife a prostitute before marriage, indignities by husband to wife's person, and willful neglect by husband": page 950.

18. "Like the duty of support during marriage and the obligation to pay alimony in the case of separation or divorce, non-support would have to be eliminated

as a ground for divorce against husbands only. . . .": page 951.

19. "The laws that grant a husband a divorce because at the time of marriage he did not know his wife was pregnant by another man would be subject to strict scrutiny under the unique physical characteristics tests": page 951.

20. "The Equal Rights Amendment would not require that alimony be abolished but only that it be available equally to husbands and wives": page 952.

21. "The laws could provide support payments for a parent with custody of a young child who stays at home to care for that child, so long as there was no legal presumption that the parent granted custody should be the mother": page 952.

22. "The ERA could require 'for maintenance to be paid from one spouse to the other if the spouse seeking maintenance lacks sufficient property to provide for his reasonable needs, and is unable to support himself through appropriate employment' ": page 952.

## XI. AMENDMENT TO THE PENNSYLVANIA CONSTITUTION APPROVED BY THE VOTERS ON MAY 18, 1971

A joint resolution proposing an amendment to article I of the Constitution of the Commonwealth of Pennsylvania prohibiting the denial or abridgement of rights because of sex was adopted by the Pennsylvania General Assembly. At the election of May 18, 1971, the voters of Pennsylvania approved the following amendment:

"That article 'One' of the Constitution of the Commonwealth be amended by adding at the end thereof, a new section: Section 27. Prohibition Against Denial or Abridgment of Equality of Rights Because of Sex.

"Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."

The subject of "Equal Rights" has been discussed in the halls of Congress for approximately 47 years. The members of the Pennsylvania Legislature were cognizant of the traditional concepts of "Equal Rights" as it affects every facet of life, including the parental and familial obligations that would be affected by the constitutional amendment in Pennsylvania. The legislators, no doubt, are familiar with the scholarly articles that appeared in the law journals of numerous law schools, a few of which have been commented upon in this opinion, and the arguments over the past years in the halls of Congress.

There are many cases wherein the courts have upheld equal rights for women, particularly in employment. This court cites but a few:

Sail'er Inn, Inc. v. Kirby, 95 Cal. Rp. 329, 334, 485 P.2d 529, 534 (1971); Weeks v. Southern Bell T. & T. Co., 408 F.2d 228, 236 (1969); Richards v. Griffith Rubber Mills, 300 F. Supp. 338, 340 (D.C. Or. 1969); Reed v. Reed, 40 L.W. 4013, 404 U.S. 71, 77:

"By providing dissimilar treatment for men and women who are thus similarly situated, the challenged section violates the Equal Protection Clause."

In the case of Pittsburgh Press Employment Advertising Discrimination Appeal, 4 Com. Ct. 448 (January 27, 1972), Judge Kramer had before him a complaint filed with the Pittsburgh Commission on Human Relations charging a violation of the Human Relations Ordinance of the City of Pittsburgh. The particular of the complaint of the National Organization for Women charged the practice of the Pittsburgh Press of allowing employers to place advertisements in male or female columns when the jobs advertised obviously do not

have bona fide occupational qualifications or exceptions, is unlawful.

At page 462, Judge Kramer said:

"To anyone who even once has viewed women participating in a roller derby, the argument that all women are the weaker sex, desirous of only the more genteel work, carries little weight."

The case of Commonwealth v. Daniel, 430 Pa. 642 (1968), concerned an attack of the constitutionality of the Muncy Act of July 25, 1913, P.L. 1311, as amended, 61 PS §551, et seq. The act provides a mandatory and exclusive procedure and sentencing provisions for women convicted of a crime punishable by imprisonment for more than one year. The validity of the Muncy Act was challenged on the ground it denied women the equal protection of laws as required by the Fourteenth Amendment to the United States Constitution.

The court said, at page 646:

"The Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States forbids a state to 'deny to any person within its jurisdiction the equal protection of the laws' . . . There is no doubt that the Muncy Act gives rise to discrimination in the sentencing of women when compared to sentences given to men convicted of the same crime, and the question arises whether such discrimination against women is constitutional." And at page 650: "While we are fully aware of the strong presumption of constitutionality which attaches to every Act of the Legislature (*Daly v. Hemphill*, 411 Pa. 263, 191 A.2d 835, and a myriad cases cited therein), we nevertheless are convinced that the Act of July 25, 1913, P.L. 1311, as amended, is devoid of reasonable grounds of differences, and is arbitrary, discriminatory and invalid under the Fourteenth Amendment of the Constitution of the United States."

Pennsylvania also found no constitutional obstacle to the addition of women to juries: Commonwealth v. Maxwell, 271 Pa. 378, 114 A.825 (1921).

## XII. CONSIDERATION BY THIS COURT OF THE CONSTITUTIONALITY OF THE DIVORCE LAW OF MAY 2, 1929 P.L. 1237, SEC. 11, 23 PS §11

The Act of May 2, 1929 P.L. 1237, sec. 11, 23 PS §11, provides, inter alia, "it shall be lawful for a wife to obtain a divorce from bed and board."

The constitutional amendment provides for "Equality of rights . . . because of the sex of the individual." This amendment was approved by the voters on May 18, 1971. The law of this state now is, that if an act discriminates because of sex, the law is unconstitutional. We are now confronted with that situation in considering the Act of May 2, 1929, P.L. 1237, sec. 11, supra.

Counsel for plaintiff-wife contended this court should treat section 11, supra, as applicable also to men by judicially amending section 11 to include men. This court is of the opinion that it would be an inappropriate judicial activity amounting to judicial legislation and, therefore, declines to legislate. In the case of Commonwealth v. Armao, 446 Pa. 325 (January 20, 1972), Mr. Justice Roberts said at page 338:

"The Commonwealth urges us to in effect redraft the criminal libel statutes in accordance with First Amendment requirements. To accede to this request would be to undertake a wholly inappropriate judicial activity amounting to judicial legislation. See State Board of Chiropractic Examiners v. Life Fellowship of Pennsylvania, 441 Pa. 293, 300, 272 A. 2d 478, 482 (1971); Saulsbury v. Bethlehem Steel Co., 413 Pa. 316, 320, 196 A. 2d 664, 667 (1964). Nor can we perceive any possible means of merely severing out the invalid

portions of the statutes, for not only must the legislative body have intended the statute or section to be separable, but also the act must be capable of separation in fact. See Saulsbury v. Bethlehem Steel Co., supra, at 320-321, 196 A.2d at 666-7."

In addition to judicial legislation, this court would also have to reverse Wick v. Wick and Hurley v. Hurley which it obviously will not do.

We must also be cognizant that the burden of proof in a bed and board divorce is different from the burden of proof in an absolute divorce.

Section 11, supra, as interpreted by the appellate courts of Pennsylvania recognizes that "a wife" plaintiff does not have to prove she is the innocent and injured spouse. In Wick v. Wick, 352 Pa. 25, 42 A. 2d 76, and Hurley v. Hurley, 180 Pa. Superior Ct. 364, 119 A. 2d 634, it was held that the wife is not precluded from securing a bed and board divorce on the ground of indignities because she is not an injured and innocent spouse since such a requirement is not contained in the code. In the Hurley case it was specifically held that:

"In our Divorce Law there is no requirement that a wife, suing for divorce a mensa et thoro because of personal indignities, must be an 'innocent and injured spouse.'"

The court also affirmed the observation of the court below that although the wife's conduct was significant to determine whether there was justification or provocation for the acts of the defendant, since it was a divorce from bed and board;

". . . The conduct of the plaintiff cannot bar either from prevailing if defendant's conduct amounts to indignities."

In the Wick Case, supra, the wife sought a bed and board divorce and defendant husband an absolute

divorce. The Supreme Court held that the husband could not obtain an absolute divorce if he cannot prove he is the injured and innocent spouse, but his wife could obtain a bed and board divorce, since she did not have to prove she was the injured and innocent spouse.

## XIII. THE EFFECT OF DECLARING THE ACT OF MAY 2, 1929, P.L. 1237, §11 UNCONSTITUTIONAL

This court recognizes that declaring the Act of May 2, 1929, P.L. 1237, §11, supra, unconstitutional, has far reaching effects on divorces which have been brought, both before and after May 18, 1971, the date of approval of the Pennsylvania Constitutional Amendment. Thus, great consideration must be given to the effect and the effective date of such a decision.

Although most constitutional questions arose in criminal cases, the principle enunciated is broad enough to be extended as a general proposition of law. In Stoval v. Denno, 388 U.S. 293, 87 S. Ct. 1967 (1967), the Supreme Court of the United States held:

"The criteria guiding resolution of the question [prospective or retroactive application of constitutional law decisions] implicate (a) the purpose to be served by the the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards and (c) the effect on the administration of justice of a retroactive application of the new standards."

The Supreme Court in justifying its decision not to make the criteria for illegal identification testimony in criminal cases retroactive in effect held that the impact upon the administration of criminal law would be so devastating as to need no elaboration. As stated, most cases arise under the criminal statutes. However, when the Court of Appeals for the Third Circuit struck

down artificially manufactured diversity of citizenship to establish Federal jurisdiction, it limited its application to those cases in which the statute of limitations had not run or where there was an agreement by the defendant that it would not be pleaded: Esposito v. Emory, 402 F. 2d 878 (C.A. 3, 1968); McSparran v. Weist, 402 F. 2d 867, cert. denied 89 S. Ct. 1739, and Groh v. Brooks, 421 F. 2d 589 (C.A. 3, 1970). Part of the rationale in the Groh case was that dismissal should not impose an unreasonable burden on either party or on the administration of justice. The criminal cases are voluminous establishing this principle. To cite a few, see Jones v. U.S., 305 F. Supp. 465 (D.C. C.D. Cal. 1969); U.S. ex rel. Dickerson v. Rundle, 430 F. 2d 462 (C.A. 3, 1970); U.S. v. Zeiler, 427 F. 2d 1305 (C.A. 3, 1970); Commonwealth v. O'Neal, 441 Pa. 17, 271 A. 2d 497 (1970); Commonwealth v. James, 440 Pa. 205, 269 A. 2d 898 (1970); Commonwealth v. Hayward, 437 Pa. 215, 263 A. 2d 330 (1970); Commonwealth v. Marino, 435 Pa. 245, 255 A. 2d 911 (1969), cert. denied 90 S. Ct. 1526; Commonwealth v. Johnson, 433 Pa. 582, 252 A. 2d 641 (1969); Commonwealth v. Littlejohn, 433 Pa. 336, 250 A. 2d 811 (1969).

Another question for consideration for this court is: Can this court pass upon the constitutionality of section 11 of the Divorce Act, supra, without destroying or impairing the entire Divorce Act? The Superior Court in the case of Faivre v. Faivre, 182 Pa. Superior Ct. 365 (1956), held there are certain substantive features for each section of the act which necessarily must remain distinct. The court said at page 368:

"Although The Divorce Law is a codification, revision, and consolidation of the law relating to divorce from the bonds of matrimony, to divorce from bed and board, and to the annulment of void marriages, 23 P.S. §1, there are certain substantive features of each

which necessarily must remain distinct. The Divorce Law sets forth the grounds for divorce from the bonds of matrimony in section 10, 23 P.S. §10, for divorce from bed and board in section 11, 23 P.S. §11, and for the annulment of void marriages in section 12, 23 P.S. §12. The remainder of the Law is devoted to jurisdictional, procedural and related matters. In order to obviate the necessity of providing a separate procedure for each of the three substantive provisions or of repeating the name of each in all of the subsequent sections, the Legislature adopted the practical expedient of setting forth a method of procedure for proceedings in divorce from the bonds of matrimony and then applying this procedure to the other two actions by means of reference. For example, we have held that section 46 of the Law, 23 P.S. §46, providing for the allowance of alimony pendente lite, counsel fees, and expenses to the wife in cases of divorce, applies to annulment proceedings even though they are not mentioned therein. Stump v. Stump, 111 Pa. Superior Ct. 541, 543, 544, 170 A. 393. The substantive law relating to divorce from the bonds of matrimony is separate and distinct from that relating to annulment proceedings; naturally the procedure which the Legislature set up for divorce proceedings would not always be entirely applicable when related to annulment proceedings."

According to the case of Faivre v. Faivre, supra, this court holds section 11, supra, unconstitutional without destroying or impairing the entire Act of May 2, 1929, supra.

Accordingly, this court holds section 11 of the Act of May 2, 1929, P.L. 1237, 23 PS §11, unconstitutional.

This court further holds that according to the many cases both in the Federal courts and Pennsylvania courts, supra, complaints in divorce for bed and board

shall not hereafter be recognized. All actions in divorce for bed and board heretofore filed shall not be impaired. All bed and board decrees in divorce heretofore granted shall remain unimpaired and shall have full force and effect.

Accordingly, this court will enter an appropriate order applicable to the within case, which will be entered according to the within opinion.

## ORDER OF COURT

And now, to wit, May 18, 1972, in accordance with the views stated in the opinion filed in this case, it is hereby ordered and decreed the "preliminary objections" filed by husband-defendant are sustained, and that section 11 of the Act of May 2, 1929, P.L. 1237, is unconstitutional because it discriminates between the sexes.